# EXHIBIT 1

Exhibit 1

| | |
|---|---|
| **From:** | Banegas, Julia Bonestroo |
| **Sent:** | Monday, May 18, 2026 7:06 PM |
| **To:** | Secretary; Judges |
| **Cc:** | Hannan, Christopher; Luther, Ilsa; Palmer, Keiana |
| **Subject:** | Complaint filed for Service |
| **Attachments:** | DQS SS FMC Complaint.pdf; DQS SS FMC Complaint Exhibits 1-13.zip |

Good afternoon,

Attached, please find the attached complaint and exhibits for service.

Respectfully submitted,
Julia Bonestroo Banegas

**Julia Bonestroo Banegas**
Special Counsel
D: 202.203.1032
jbanegas@joneswalker.com



Jones Walker LLP
1 M Street SE, Ste 600
Washington, D.C. 20003
**joneswalker.com**

Exhibit 1

**BEFORE THE FEDERAL MARITIME COMMISSION**

---

**DOCKET NO. 26-___**

---

**DOWN QUARK SYSTEMS LLC, SUNNYSIDE DIGITAL INC.,**

**COMPLAINANTS**

**v.**

**ZIM AMERICAN INTEGRATED SHIPPING SERVICES CO., LLC;**
**ZIM INTEGRATED SHIPPING SERVICES LTD.;**
**PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS,** *(OWNER AND*
*OPERATOR OF THE BAYPORT CONTAINER TERMINAL)***,**

**RESPONDENTS**

---

**<u>VERIFIED COMPLAINT</u>**

**<u>INTRODUCTION</u>**

**1.**

Complainants Down Quark Systems LLC ("**DQS**"), and SunnySide Digital Inc. ("**SunnySide**") by their undersigned attorneys, file this Verified Complaint (pursuant to the procedural provisions of 46 U.S.C. § 41301, § 41305 and 46 C.F.R. § 502.62 *et seq.*) against Respondents seeking the following remedies with respect to one hundred forty-seven specialized containers owned at all pertinent times by DQS (the "**Containers**") and shipped from China to the Bayport Container Terminal in Houston via ocean carriage on a vessel operated by Respondents Zim American Integrated Shipping Services Co., LLC ("**Zim US**") and Zim Integrated Shipping Services Ltd. ("**Zim ISS**") (together "**Zim Respondents**"):

1. **<u>restitution/reparations</u>** for the following improperly invoiced and charged amounts:

   a. **$5,880** in demurrage charges invoiced by Zim Respondents ("**CES Demurrage Invoices**") and paid by Sunnyside with funds provided by DQS with respect to some

1

of the Containers while subject to examination by U.S. Customs and Border Patrol ("**CBP**"); and

b. **$917,458.74**, in "dwell" charges charged by Respondent Port of Houston Authority of Harris County, Texas ("**Houston Bayport**") and paid by Sunnyside with funds provided by DQS ("**Port Import Dwell Fees**");

all in violation of applicable ocean common carrier and/or marine terminal operator ("**MTO**") tariff terms; and/or applicable provisions and regulations of the Federal Maritime Commission ("**FMC**" or "**Commission**"), including without limitation the principles of the final rule published on May 18, 2020, entitled "Interpretive Rule on Demurrage and Detention Under the Shipping Act" ("**D&D Rule**"); and the Shipping Act, 46 U.S.C. § 41102(c), § 41104(a)(2)(A), § 41104(a)(4), § 41104(a)(14), § 41104(a)(15)(A) & (B), § 41104(d); as well as 46 C.F.R. Part 541 and 46 C.F.R. §§ 545.4 and 545.5;

2. for an **investigation and order** from the Commission directing the Zim Respondents to cease and desist from pursuing **$7,056,260** in wrongfully invoiced demurrage amounts ("**Zim Demurrage Invoices**") for the Containers and from pursuing **$708,153** in "terminal storage" demurrage charges based on un-invoiced amounts alleged in the recent SD Tex Suit (defined below), to the extent the $708,153 is not included in the $7,056,260, and to withdraw Zim Demurrage Invoices, all of which were issued in violation of the principles of the D&D Rule; and the Shipping Act, as amended, 46 U.S.C. § 41102(c), § 41104(a)(2)(A), § 41104(a)(4), § 41104(a)(14), § 41104(a)(15)(A) & (B),§ 41104(d); as well as 46 C.F.R. Part 541 and 46 C.F.R. §§ 545.4 and 545.5.

## I.    COMPLAINANTS

### 2.

Complainants are identified as follows:

a. DQS is a Delaware limited liability company with its principal place of business in Delaware. DQS manages the commercial use of the Containers and provided funds to pay the amounts for which Complainants seek restitution and reparations in these proceedings.

    i.   To the extent any of the demurrage or "dwell" charges at issue in this matter are determined to be valid and properly chargeable (which Complainants dispute for all the reasons set forth in this Complaint), DQS would be the proper party responsible to pay any such amounts in relation to the Containers and the CES

2

Exhibit 1

Demurrage Invoices, Zim Demurrage Invoices, and the Port Import Dwell Fees. *See also* FN 63 *infra*.

b. Sunnyside Digital Inc. is an Ontario corporation with its principal place of business in Ontario, Canada.

### 3.

DQS provides various hardware and equipment to end-use customers for use in bitcoin mining and other cryptocurrency related data center applications. SunnySide was the importer of record for the subject shipments, and acted as an agent on behalf of DQS with respect to the shipments and the facts set forth in this Complaint, including without limitation transacting payments with funds provided by DQS for certain of the invalid and improper charges at issue in this matter (as detailed below).

### II.     RESPONDENTS

### 4.

Respondent Zim Integrated Shipping Services Ltd. is a global ocean carrier (organized under 46 C.F.R. § 520.3 as organization number 019210) with its corporate office at 9 Andrei Sakharov St., "Matam" - Scientific Industries Center, P.O.B. 1723, Haifa 31016, Israel, conducting business in the United States through its general agent Respondent Zim American Integrated Shipping Services Co. LLC, with its principal corporate office at 5801 Lake Wright Drive, Norfolk, VA 23502.

### 5.

The Zim Respondents (collectively) are a vessel operating "ocean common carrier" as that term is defined by 46 U.S.C. § 40102(7) and (18) and are subject to regulation by the FMC.

3

**6.**

Respondent Houston Bayport is the governmental entity organized and existing under the laws of the State of Texas; and more specifically "is a political subdivision of the State of Texas and a body politic" and the "proprietor and operator" of the Houston Bayport Container Terminal according to the Houston Bayport Tariff No. 15 in effect at that time of the discharge of the Containers at the Bayport Container Terminal.[1]

**7.**

The address of the "Executive Offices" of Houston Bayport is 111 East Loop North, Houston, TX 77029; and the physical address for the Houston Bayport terminal facility is 12619 Port Road, Pasadena, TX 77586.

**8.**

Houston Bayport is a "marine terminal operator" ("MTO," as defined in the Shipping Act at 46 U.S.C. § 40102(15) and FMC regulation 46 C.F.R. § 525.1(c)(13)) registered with the FMC (Organization No. 001947); and subject to FMC jurisdiction and regulation with respect to contractual enforcement of its Tariff No. 15 as an MTO "operator schedule" (as defined in the Shipping Act at 46 U.S.C. § 40501(f) and FMC regulation 46 C.F.R. § 525.1(c)(17) and § 525.2) under the pertinent provisions of 46 U.S.C. §§ 41102 and 41106.

**9.**

Houston Bayport is a proper party as an FMC-registered/regulated MTO under the Shipping Act and FMC regulations, as acknowledged in Houston Bayport Tariff No. 15.[2]

---

[1] *See* Port of Houston Tarriff No. 15, Subrule Nos. 025 and 055 (effective Jan. 1, 2025), https://porthouston.com/wp-content/uploads/2024/12/v2-Tariff-15.-January-1-2025-12.5.24.pdf (hereafter "**Houston Bayport Tariff No. 15**").

[2] *See* Houston Bayport Tariff No. 15, Subrule 055(2) ("[T]he Port Authority's liability for any cause whatsoever shall be as set forth in this tariff and in any other of its governing tariffs, and

4

Exhibit 1

## III.    JURISDICTION

### 10.

The FMC has subject-matter jurisdiction over this Complaint pursuant to the Shipping Act of 1984, as amended, 46 U.S.C. § 40101 *et seq.*

### 11.

This Complaint is timely pursuant to 46 C.F.R. § 502.62(a)(4) and § 502.302(a) because it is being brought within three years from the time of the alleged Shipping Act violations and/or payment of invalid charges, and thus within three years of the accrual of the claims asserted; and is timely filed under the dispute resolution requirements of 46 C.F.R. § 541.8.

### 12.

This Complaint is being filed pursuant to Section 11(a) of the Shipping Act, 46 U.S.C. § 41301. Complainants are seeking a cease-and-desist order and/or reparations for injuries caused to it by Respondents due to the violations of the Shipping Act.

### 13.

The FMC has personal jurisdiction over Zim ISS as the "common carrier" and a vessel operating "ocean common carrier," as defined in 46 U.S.C. § 40102(7) and (18), with respect to the Shipping Act violations alleged in this Complaint (as confirmed in a recent proceeding before

---

applicable law, and, if a suit or complaint of any kind whatsoever respecting such liability is brought or filed, it shall be heard and determined only in the [U.S.], and in a federal or state court, **or federal** or state **agency**, whose venue and jurisdictional requirements are satisfied.").

5

#111642637v5

the FMC[3]); and likewise against Zim US as the general agent of Zim ISS[4] (and thus jurisdiction lies against both Zim Respondents collectively in their capacity as "common carrier" and "ocean common carrier").

**14.**

The Zim Respondents' actions alleged herein constitute failures to establish, observe, and enforce just and reasonable practices related to receiving, handling, storing, and delivering the property of DQS, in violation of 46 U.S.C. § 41102(c) (unreasonable practices); 46 U.S.C. § 41104(a)(2) (providing liner service not in accordance with published tariff rates/terms); and 46 U.S.C. § 41104(a)(14), (15)(A), (B), as well as 46 C.F.R. Part 541 and 46 C.F.R. §§ 545.4 and 545.5 (invoicing without required compliance with the D&D Rule).

**15.**

Houston Bayport's actions constitute failures to establish, observe, and enforce just and reasonable practices related to receiving, handling, and storing the property of DQS, in violation

---

[3] *Samsung Electronics Am., Inc.v. Zim Integrated Shipping Servs. Ltd.*, Dkt. No. 22-30 (ALJ Apr. 22, 2025) FMC LEXIS 304, *100 (citing *Anchor Shipping Co. v. Aliança Navegação E Logística Ltda*., Dkt. No. 02-04, 30 S.R.R. 991, 2006 WL 2007808, 2006 FMC LEXIS 19 at *10-11 (FMC May 10, 2006) (the Commission is obligated to hear allegations particular to the Shipping Act, even where the complainant has already obtained an arbitration award for related breach of contract claims); *see also Cargo One, Inc. v. COSCO Container Lines Co*., Dkt. No. 99-24, 28 S.R.R. 1635, 1645, 2000 WL 1648961, at *15 (FMC Oct. 31, 2000) (the Commission must address allegations of violations of the Shipping Act, which are within its exclusive jurisdiction; no common law remedy exists for such violations). The Commission has an obligation to address Shipping Act claims, even if the relevant facts may also give rise to other claims between the parties. *MCS Indus., Inc. v. Mediterranean Shipping Co. S.A*., Dkt. No. 21-05, 2024 WL 95383, at *7 (FMC Jan. 3, 2024) (Shipping Act claims are distinct from breach of contract claims, entailing a different analysis of statutory standards that includes review of the carrier's broader practices beyond those directly affecting the complainant).).

[4] The Commission has found that an agent for a VOCC can be subjected to FMC jurisdiction if it is named as a respondent in an FMC proceeding along with its principal VOCC. *TCW, Inc. v. Evergreen Shipping Agency (AM.) Corp.*, Dkt. No. 1966(I), 2022 WL 18068977 at *1 (FMC Dec. 29, 2022).

6

of 46 U.S.C. § 41102(c) (unreasonable practices) as well as 46 C.F.R. Part 541 and 46 C.F.R.

§§ 545.4 and 545.5 (invoicing without required compliance with the D&D Rule); and in violation

of 46 U.S.C. § 41106 (imposing undue or unreasonable prejudice or disadvantage as an MTO).

**16.**

Pursuant to 46 U.S.C. § 41301(a), the FMC has exclusive jurisdiction over the claims in

this Complaint regarding invalid demurrage (including any designated as "dwell" charges):

> Pursuant to [Section 41301], the Commission has jurisdiction over a complaint alleging that a respondent committed an act prohibited by the Shipping Act. *See Anchor Shipping Co. v. Aliança Navegação E Logística Ltda.*, Dkt. No. 02-04, 30 S.R.R. 991, 2006 WL 2007808, at *10-11 (FMC May 10, 2006) (the Commission was obligated to hear allegations particular to the Shipping Act, even where the complainant has already obtained an arbitration award for related breach of contract claims); *see also Cargo One, Inc. v. COSCO Container Lines Co.*, Dkt. No. 99-24, 28 S.R.R. 1635, 1645, 2000 WL 1648961, at *15 (FMC Oct. 31, 2000) (the Commission must address allegations of violations of the Shipping Act, which are within its exclusive jurisdiction; no common law remedy exists for such violations).

> The Commission has an obligation to address Shipping Act claims, even if the relevant facts may also give rise to other claims between the parties. *MCS Indus., Inc. v. Mediterranean Shipping Co. S.A.*, Dkt. No. 21-05, 2024 WL 95383, at *7 (FMC Jan. 3, 2024). The Commission has jurisdiction over Shipping Act claims even if a related proceeding is underway. *Id.* Shipping Act claims are distinct from breach of contract claims, entailing a different analysis of statutory standards that includes review of the carrier's broader practices beyond those directly affecting the complainant. *Id.* While breach of contract claims are resolved in court or as otherwise agreed by the parties, **a claim for violation of the Shipping Act may only be resolved by the Commission**.[5]

---

[5] *Samsung Electronics Am., Inc., v. SM Line Corp.*, Dkt. No. 23-01, 2025 FMC LEXIS 398, *79-80 (ALJ May 28, 2025). *See also Acme Freight Servs. Corp. v. Total Terminals Int'l*, Dkt. No. 22-07, 2022 WL 1772290, at *4 (FMC A.L.J. May 26, 2022) (denying a motion to dismiss because the "complaint alleges that the assessment of demurrage charges during the CBP hold on the Containers was inconsistent with the FMC's interpretative rule on demurrage and detention found at 46 C.F.R. § 545.5 and [§]41102(c) of the Shipping Act" because such conduct "plausibly alleges a violation of the Commission's Detention and Demurrage Rule").

#111642637v5

## IV.    FACTUAL ALLEGATIONS

### A.    Ocean Shipment of the Containers

**17.**

In February of 2025, Complainants arranged for the shipment of the Containers for eventual delivery to end-use customers in the United States.

**18.**

The Containers are not typical cargo shipping containers used to transport miscellaneous cargo within the containers. Rather, they are specialized purpose-built modules that utilize a standard 20-foot high-cube container outfitted as a cabinet or a cooling tower that (collectively) serve as modularly arrangeable apparatuses for bitcoin mining operations, as shown in the below exemplary illustrations of the cabinet (*left*) and cooling tower (*right*):

 

Thus, the Containers, with their interior integrated components, were *themselves* the cargo. [6]

**19.**

The total value of the Containers based on the invoiced purchase prices was $3,675,000.

---

[6] Notwithstanding their bespoke non-cargo function, the Containers are identified by specific container numbers (as is typical with standard cargo containers).

8

Exhibit 1

**20.**

On or about March 2025 Complainants (via certain intermediaries[7]) arranged for the ocean shipment of the Containers from the port of Shanghai, China to Houston, Texas.

**21.**

The Containers were loaded onto the Zim Respondents' vessel ZIM CANADA on or about March 17, 2025 at the port of Shanghai, China for shipment to the Houston Bayport terminal pursuant to seven (7) bills of lading ("BLs") issued by Zim ISS.[8]

**22.**

The China-based NVOCC Shenzhen issued its own house BLs dated March 13, 2025.[9]

**23.**

The below chart identifies the Containers by number and corresponding Zim BL and Shenzhen House BL numbers:

| Container Number | Zim BL<br>*issued March 17, 2025* | Shenzhen House BL<br>*issued March 13, 2025* |
|---|---|---|
| 1. BTMU2220871<br>2. BTMU2220803<br>3. BTMU2220721<br>4. BTMU2220974*<br>5. BTMU2212330 | ZIMUSNH7771956 | 2503HOU0636F |

---

[7] Specifically, Shenzhen Perdo International Logistics Co., Ltd. (**"Shenzhen"**) acted as the China-based non-vessel operating common carrier ("**NVOCC**") that booked ocean carriage on the ZIM CANADA; Kesco Customs Solutions, Inc. (located in New York) acted as the customs broker for Sunnyside, as the importer of record; and TD Logistics, Inc. ("**TD Logistics**") acted as the destination agent for Shenzhen. At all pertinent times, the Containers were owned by DQS. Shenzhen was formerly an FMC-registered OTI, but its registration was terminated by the FMC for failure to maintain a bond, effective May 11, 2025 (shortly after the shipment of the Containers). *See* FMC, *Foreign Registered NVOCC Terminations & Surrenders May 1, 2025 to May 31, 2025*, https://www.fmc.gov/wp-content/uploads/2025/06/2025.05-May-Foreign-NVOCC-Terminations-Surrenders.pdf.

[8] Exhibit 1.

[9] Exhibit 2.

9

| Container Number | Zim BL issued March 17, 2025 | Shenzhen House BL issued March 13, 2025 |
|---|---|---|
| 6. BTMU2212460<br>7. BTMU2212367<br>8. BTMU2212794<br>9. BTMU2212454<br>10. BTMU2212789<br>11. BTMU2212752<br>12. BTMU2212412<br>13. BTMU2212433<br>14. BTMU2212686<br>15. BTMU2212407<br>16. BTMU2212449<br>17. BTMU2212270*<br>18. BTMU2212304<br>19. BTMU2212773<br>20. BTMU2212290<br>21. BTMU2212747<br>22. BTMU2212731<br>23. BTMU2220819 | | |
| 24. BTMU1021350*<br>25. BTMU1021366<br>26. BTMU1021371<br>27. BTMU1021387<br>28. BTMU1021392<br>29. BTMU1021427<br>30. BTMU1021432<br>31. BTMU1021509<br>32. BTMU1021514<br>33. BTMU1021520<br>34. BTMU1900719<br>35. BTMU1900724*<br>36. BTMU1900730<br>37. BTMU1900745<br>38. BTMU1900750<br>39. BTMU1900853<br>40. BTMU1900869<br>41. BTMU1900874<br>42. BTMU1900914<br>43. BTMU1900920<br>44. BTMU1900935*<br>45. BTMU1900956 | ZIMUSNH7771953 | 2503HOU0640F |
| 46. BTMU1021279*<br>47. BTMU1021319*<br>48. BTMU1021324<br>49. BTMU1021448* | ZIMUSNH7771955 | 2503HOU0641F |

#111642637v5

Exhibit 1

| Container Number | Zim BL<br>*issued March 17, 2025* | Shenzhen House BL<br>*issued March 13, 2025* |
|---|---|---|
| 50. BTMU1021453<br>51. BTMU1021469<br>52. BTMU1021474<br>53. BTMU1021495<br>54. BTMU1900766<br>55. BTMU1900771<br>56. BTMU1900787<br>57. BTMU1900792<br>58. BTMU1900806*<br>59. BTMU1900811<br>60. BTMU1900827<br>61. BTMU1900832<br>62. BTMU1900848<br>63. BTMU1900940<br>64. BTMU1900961<br>65. BTMU1900977<br>66. BTMU1900982<br>67. BTMU1900998 | | |
| 68. BTMU1014304<br>69. BTMU1014325<br>70. BTMU1014372<br>71. BTMU1014412<br>72. BTMU1014557<br>73. BTMU1014562<br>74. BTMU1014644<br>75. BTMU1014691<br>76. BTMU1014705<br>77. BTMU1014726<br>78. BTMU1014731<br>79. BTMU1014808<br>80. BTMU1014829<br>81. BTMU1014834<br>82. BTMU1901119<br>83. BTMU1901171<br>84. BTMU1901192<br>85. BTMU1901227<br>86. BTMU1901232<br>87. BTMU1901248 | ZIMUSNH7771954 | 2503HOU0642F |
| 88. BTMU1014942<br>89. BTMU1901377<br>90. BTMU1014984<br>91. BTMU1014990<br>92. BTMU1015018<br>93. BTMU1015189 | ZIMUSNH7771959 | 2503HOU0643F |

#111642637v5

Exhibit 1

| Container Number | Zim BL *issued March 17, 2025* | Shenzhen House BL *issued March 13, 2025* |
|---|---|---|
| 94. BTMU1015147<br>95. BTMU1901274<br>96. BTMU1015152<br>97. BTMU1901398<br>98. BTMU1015208<br>99. BTMU1901320<br>100. BTMU1901269<br>101. BTMU1901438<br>102. BTMU1901335<br>103. BTMU1901340<br>104. BTMU1901382<br>105. BTMU1901459<br>106. BTMU1901443<br>107. BTMU1901464 | | |
| 108. BTMU1014109<br>109. BTMU1014120<br>110. BTMU1014135<br>111. BTMU1015126<br>112. BTMU1014618<br>113. BTMU1014623<br>114. BTMU1014768<br>115. BTMU1014963<br>116. BTMU1014860<br>117. BTMU1014979<br>118. BTMU1014876<br>119. BTMU1014937<br>120. BTMU1014897<br>121. BTMU1014916<br>122. BTMU1014958<br>123. BTMU1015086<br>124. BTMU1015091<br>125. BTMU1015110<br>126. BTMU1901021<br>127. BTMU1015105 | ZIMUSNH7771957 | 2503HOU0644F |
| 128. BTMU1013910<br>129. BTMU1014881<br>130. BTMU1013967<br>131. BTMU1014095<br>132. BTMU1014032<br>133. BTMU1014053<br>134. BTMU1014048<br>135. BTMU1901090<br>136. BTMU1014069<br>137. BTMU1014710 | ZIMUSNH7771958 | 2503HOU0644F |

12

| Container Number | Zim BL issued March 17, 2025 | Shenzhen House BL issued March 13, 2025 |
|---|---|---|
| 138. BTMU1014114 139. BTMU1901079 140. BTMU1014639 141. BTMU1901063 142. BTMU1014650 143. BTMU1014921 144. BTMU1901016 145. BTMU1901058 146. BTMU1901037 147. BTMU1901042 | | |

**24.**

The Containers were transported and discharged without incident at the Houston Bayport Container Terminal on or about April 17, 2025.

**B.      Customs Entry and Initial CBP Hold and Inspections**

**25.**

The Containers were entered pursuant to CBP Form 7501 Entry Summaries ("**CBP Entries**") submitted on April 17, 2025 corresponding to the BLs/House BLs as follows:

| FORM 7501 ENTRY | ZIM BL issued March 17, 2025 | SHENZHEN HOUSE BL issued March 13, 2025 |
|---|---|---|
| 83M00251241 | ZIMUSNH7771956 | 2503HOU0636F |
| 83M00251258 | ZIMUSNH7771953 | 2503HOU0640F |
| 83M00251274 | ZIMUSNH7771955 | 2503HOU0641F |
| 83M00251282 | ZIMUSNH7771954 | 2503HOU0642F |
| 83M00251308 | ZIMUSNH7771959 | 2503HOU0643F |
| 83M00251316 | ZIMUSNH7771957 | 2503HOU0644F |
| 83M00251324 | ZIMUSNH7771958 | 2503HOU0645F |

**26.**

The Entry Summaries for the Containers used substantially identical Harmonized Tariff Schedule ("**HTS**")  Codes to prior shipments in 2025 involving 370 substantially identical China-origin imported container cabinet/cooling units previously purchased/imported by or on behalf of DQS, none of which were subject to CBP inspections or holds.

13

#111642637v5

**27.**

Pursuant to the Zim Respondents' governing rules tariff (Tariff #ZIMU 480, "TRANSPACIFIC EB RULES TARIFF," hereafter "**Zim Tariff**")), the Containers were subject to four (4) days of free time, commencing Friday April 18, 2025.  However, that date was a holiday for Houston Bayport (namely, Good Friday[10]) and thus was excluded, as were non-working days Saturday and Sunday April 19 and 20, 2025.[11]

**28.**

Accordingly, Free Time for the Containers under the Zim Tariff was due to expire on Thursday April 24, 2025.

**29.**

However, on April 21, 2025 (before expiration of Free Time) CBP issued an initial hold on all the Containers; and thereafter between April 22 and 23 (again, all before expiration of Free Time) CBP advised that it would be reviewing shipment of the Containers and selected nine (9) of the Containers (noted with an asterisk (*) in the above chart, "**CES Containers**"[12]) from three of the seven BL/House BL groups for initial exam at a CBP centralized examination station ("**CES**").

**30.**

CBP did not at this time advise as to the nature of its concerns or the basis on which it was undertaking review and inspection of the Containers.

---

[10] Available at https://www.txgulf.org/events/good-friday-holiday-copy.

[11] *See* Zim Tariff at Rule No. 023. Subrule 01, cross-referencing and incorporating Zim Respondents' Tariff # ZIMU-136 ("EQUIPMENT INTERCHANGE TARIFF"), Rule 4.0: "Free Time will commence at 0001 on the day after the container discharges at ocean terminal"; and providing four (4) working days' Free Time for 20' HC containers like the Containers.

[12] BTMU1021279, BTMU1021319, BTMU1021350, BTMU1021448, BTMU1900724, BTMU1900806, BTMU1900935, BTMU2212270, BTMU220974.

14

**31.**

At this point, it was impossible for Complainants to move any of the Containers from the Houston Bayport terminal due to the ongoing CBP hold, thus implicating the "primary focus [of the FMC's D&D Rule] . . . where demurrage and detention do not work because cargo cannot move."[13]  As such, any demurrage (including charges designated as "dwell" charges) assessed during this timeframe were not serving the incentive principle framework mandated under the Shipping Act and FMC regulations.[14]

**32.**

From April 23, 2025 until May 6, 2025, despite numerous communications from/on behalf of Complainants, CBP did not provide any further information regarding the basis for the hold on or inspection of the Containers.

**C.     CBP Detention of the Containers and Efforts to Procure Release**

**33.**

Finally, on May 7, 2025 CBP issued formal detention notices (corresponding to the seven CBP Entry numbers) covering all 147 of the Containers on grounds of classification, "[r]ight to Make Entry, admissibility review, as well as value determination."[15]

---

[13] 85 Fed. Reg. 29,638, 29,648 (May 18, 2020).  *See also* 84 Fed. Reg. 48,850, 48,852 (Sept. 17, 2019) ("[I]f a cargo interest . . . cannot retrieve cargo from a marine terminal because the cargo is not available for retrieval due to circumstances such as weather, port or terminal closures, the container is in a closed area, or government inspections of the cargo, demurrage would not serve as an effective incentive for cargo retrieval.").

[14] Under the incentive principle, "[i]n assessing the reasonableness of demurrage and detention practices and regulations, the Commission will consider the extent to which demurrage and detention are serving their intended primary purposes as financial incentives to promote freight fluidity." 46 C.F.R. § 545.5(c)(1).

[15] Exhibit 3.

15

**34.**

Complainants immediately retained outside counsel to address the CBP detention issues, and on May 12, 2025 made an initial request for additional documentation from CBP to address the bases for the hold identified in the detention notices, including admissibility, particularly in light of the fact that substantially identical prior shipments of similar containers had not been challenged.

**35.**

Complainants' customs counsel remained in correspondence with CBP throughout May, 2025.

**36.**

As a result of the above, it continued to be impossible for Complainants to move any of the Containers from the Houston Bayport terminal due to the ongoing CBP hold, and any demurrage (including any designated "dwell" charges) assessed during this timeframe were not serving the incentive principle framework mandated under the Shipping Act and FMC regulations.

**D.   CBP Proposals/ Delays Regarding Container Release; CBP Non-Responsiveness**

**37.**

Eventually, in correspondence of June 2, 2025, CBP confirmed it would consider releasing the Containers *only* if Complainants would agree to much higher valuations offered by CBP (and which Complainants at all pertinent times have disputed) and different HTS classification codes; or subject to CBP's review and approval of documentation evidencing proof of entered value.[16]

---

[16] CBP also offered the potential option of moving the Containers to a bonded warehouse pending resolution of the classification and valuation issues, but Complainant SunnySide was advised that CBP would have a response shortly and the hold would be resolved in short order.

16

#111642637v5

**38.**

SunnySide responded to CBP's requested value information on June 24, 2025, with the delay attributable to Complainants' efforts to compile the best responsive evidence for valuation based on the "transaction value" (as per 19 U.S.C. § 1401a) of the sale of the Containers, which took time due to the complexity of the underlying sales transaction.[17]

**39.**

After the June 24, 2024 response providing the requested information, CBP did not respond (besides a few automated out-of-office replies) to multiple follow-up correspondences from counsel inquiring as to the status of the detained Containers and whether or when they would be released based on the information provided in the June 24 response.

**40.**

From June 24, 2025 until July 30, 2025, despite numerous telephone and email communications from Complainants, CBP did not provide any substantive response or further information regarding the ongoing hold on the Containers.

**41.**

On July 30, 2025, after CBP finally responded and rejected Complainants' valuation proofs (as discussed further below), SunnySide requested bond amount information from CBP, and was given the bond amount on July 31, 2025.

**42.**

During this timeframe, including without limitation all delays attributable to CBP non-responsiveness, it remained impossible for Complainants to move any of the Containers from the

---

[17] Specifically, for example, the sales transaction was denominated using a stablecoin cryptocurrency, and was part of a larger-scale sales transaction that included other parties and additional equipment that had not yet been invoiced.

17

Houston Bayport terminal due to the ongoing CBP hold/detention, and any demurrage/"dwell" charges assessed during this timeframe were not serving the incentive principle framework mandated under the Shipping Act and FMC regulations.

**E.    Zim's Invalid June 4, 2025 Demurrage Invoices for CES Inspections**

**43.**

Shortly after CBP's June 2, 2024 correspondence, on June 4, 2025 Zim US issued the three CES Demurrage Invoices (totaling $5,880) to TD Logistics, for six of the nine Containers that had been removed for inspection at CES (specifically, the six that were removed to CES on April 28, 2025 after expiration of free time under the Zim Tariff).[18]

**44.**

The CES Demurrage Invoices were issued in violation of 46 C.F.R. § 541.7(a) and 46 U.S.C. § 41104(a)(15) because they were not issued "within thirty (30) calendar days from the date on which the charge was last incurred [i.e. within 30 days from April 28, 2025]." Accordingly, the demurrage charges reflected in the CES Demurrage Invoices were not required to be paid pursuant to § 541.7.

**45.**

The CES Demurrage Invoices also violated 46 C.F.R. § 541.6(a)(4) and 46 U.S.C. § 41104(a)(15)  because they do not identify "[t]he basis for why the billed party [TD Logistics] is the proper party of interest" for the charges. Accordingly, the demurrage charges reflected in the CES Demurrage Invoices were not required to be paid pursuant to 46 C.F.R. § 541.5.

---

[18]  *See* Exhibit 4.

18

#111642637v5

**46.**

Further, the CES Demurrage Invoices violate the D&D Rule, 46 U.S.C. § 41104(a)(14), 46 C.F.R. § 545.5, and the incentive principle, because at all times before removal of the CES Containers to CES, CBP had imposed a hold that Complainants had valid and good faith grounds to dispute; and Complainants had no ability to move the Containers to further freight fluidity.

**47.**

Complainants eventually paid $5,880 for the invalid CES Demurrage Invoices on August 25, 2025 to facilitate ongoing efforts to effect release of the Containers,[19] but *only after* CBP agreed to withdraw detention of the Containers subject to a $4 million bond (discussed below).

**F.      CBP's July 30 Response Rejecting Transaction Valuation; Interim Resolution and CBP Delays in Approving Bond**

**48.**

CBP did not respond to the June 24, 2025 submission until more than a month later via email of July 30, 2025, rejecting Complainants' transaction-value documentation/evidence.

**49.**

At this point, in light of CBP's continuous pattern of delays and unreasonable refusal to accept evidence of actual valuation for the Containers and process their release and final entry, counsel inquired the same day (July 30, 2025) whether and in what amount CBP would accept a bond to allow for release of the Containers.

**50.**

CBP responded on July 31, 2025 and August 1, 2025 confirming it would allow release of the Containers at the declared values in the CBP Entries (i.e. the lower "transaction value" reflected

---

[19] Exhibit 5.

19

in the documentation provided to CBP) subject to a $4 million enhanced continuous bond to remain in place pending further resolution efforts with CBP regarding the valuation issue.

**51.**

The classification issues (i.e. applicable HTS codes) were resolved with CBP, which notably resulted in a *more favorable* classification status (from a valuation standpoint) for the Containers than in the original April 17 CBP Entries.

**52.**

Specifically, as part of the provisional resolution with CBP as to valuation, Sunnyside eventually re-submitted updated CBP Form 7501 Entry Summaries (dated September 16, 2025[20]) with the updated HTS classifications that resulted in *lower* duty charges on the Containers, which CBP accepted subject to the $4 million bond requirement. In other words, Complainants' pursuit of the validity of the CBP Entries against CBP's objections ultimately resulted in a **more favorable outcome** (i.e. lower dutiable value) than the original CBP Entries submitted in April (albeit subject to CBP's right to potentially pursue higher valuation against the bond).

**53.**

Between August 1 and September 15, 2025, Complainants undertook efforts to procure the $4 million dollar bond, including negotiating and procuring the substantial security required for issuance of the bond (the surety company required security of the full $4 million), all of which contributed to the length of time required to procure the enhanced continuous bond due to the high value required.

---

[20] Exhibit 6.

20

**54.**

During this same period, Complainants also sought to confirm with CBP that the Containers would NOT be sent to general order at the Houston Bayport terminal. CBP deferred to the Houston Bayport Terminal as to the "general order" question.

**55.**

The CBP-required bond (Bond No. 25C001SO5) was executed on August 25, 2025 and became effective on September 15, 2025 upon finalization of security.[21]

**56.**

During this timeframe (July 30 through September 15, 2025), it remained impossible for Complainants to move any of the Containers from the Houston Bayport terminal due to the ongoing CBP hold/detention until (at the earliest) a bond was procured and accepted by CBP; and any demurrage/"dwell" charges assessed during this timeframe were not serving the incentive principle framework mandated under the Shipping Act and FMC regulations.

**G.    Parallel Delays and Invalid Port "Dwell" Charges by Houston Bayport**

**57.**

As part of the process of effecting release of the Containers after the bond was accepted by CBP, Complainants coordinated with Houston Bayport to schedule pickup of the Containers from the Terminal.

**58.**

During the above discussed periods, Houston Bayport was accruing charges ultimately charged to DQS (via Sunnyside) through the Houston Bayport "Lynx Portal" as an otherwise unspecified "Import Dwell Fee" for the Containers.

---

[21] *See* Exhibit 7.  DQS reserved all rights and continues to dispute CBP's excessive valuations.

21

#111642637v5

Exhibit 1

**59.**

Pursuant to Houston Bayport Tariff No. 15 Subrule No. 095A, "SUSTAINED IMPORT DWELL" fees are accrued for imported containers as follows: "Commencing on the eighth day after expiration of free time [i.e. seven (7) days per Houston Bayport Tariff No. 15, Subrule No. 095] . . . any such unit [i.e. loaded import containers] will be charged $46.44 per day, inclusive of days when Terminal truck gates are closed for scheduled terminal closures."[22]

**60.**

These "SUSTAINED IMPORT DWELL FEES" are "charged in addition to the demurrage for loaded import containers provided for in Subrule 095."[23]

**61.**

Additionally, the Houston Bayport Tariff provides that "[a]ccrual of Sustained Import Dwell Fees may be suspended during a period of which [Houston Bayport] determines that their assessment is not incentivizing the movement of loaded import containers,"[24] in recognition of the incentive principle governing MTO's under the FMC's D&D Rule and regulations.

**62.**

Moreover, Houston Bayport's "Dwell Fee Information" summary on its website specifies that "SUSTAINED IMPORT DWELL FEES" apply only to "to all loaded import containers"; and likewise states that **"[n]o invoices will be sent"** (emphasis added) with respect to such fees.[25]

---

[22] Houston Bayport Tariff No. 15, Subrule 095A, https://porthouston.com/wp-content/uploads/2024/12/v2-Tariff-15.-January-1-2025-12.5.24.pdf.

[23] *Id.*

[24] *Id.*

[25] https://porthouston.com/wp-content/uploads/2025/06/2025_Dwell-Fees.pdf.

22

#111642637v5

**63.**

In conjunction with finalizing the CBP-required bond to allow for release of the Containers, Complainants submitted an August 25, 2025 request[26] for waiver of the accrued Port Import Dwell Fees being charged by Houston Bayport, which totaled (at that time) $820,125.45, on the basis that they were improperly charged (*inter alia*) under 46 C.F.R. § 545.5/the D&D Rule in light of CBP's unreasonable hold/detention and delays in resolving the situation.

**64.**

Given the urgency of the situation, Sunnyside attempted the next day to contact Houston Bayport, via multiple emails and phone calls, and was eventually told that any waiver request for the charges would have to be negotiated with Zim Respondents—*despite* the fact (as Sunnyside re-emphasized to Houston Bayport) that the "dwell" charges were **directly issued by Houston Bayport**.

**65.**

Complainants continued to pursue this waiver request, including a mitigation request for a 25% adjustment of the "dwell" charges, but it was ultimately denied by Houston Bayport on September 9, 2025 on the basis of "ensur[ing] efficiency and fairness across the terminal," which notably does not address in any way the incentive principle that is the explicit purpose of the fees under Houston Bayport Tariff No. 15 Subrule 095A and the D&D Rule and FMC regulations.

**66.**

Houston Bayport continued to accrue Port Import Dwell Fee charges for the Containers throughout this period of Complainants' waiver request, and after through September 22, 2025.

---

[26] Exhibit 8.

#111642637v5

**67.**

In this interim, Complainants advised Houston Bayport on September 19 (four days after CBP's unreasonably delayed approval of the bond) that CBP would be releasing the Containers.

**68.**

However, Houston Bayport responded on that date—and repeated for the *next three days* through September 22, 2025—that the Lynx Portal system was not showing that CBP had released the Containers, notwithstanding Sunnyside's provision of Automated Commercial Environment ("**ACE**") system documentation confirming CBP's release.

**69.**

Accordingly, Houston Bayport's internal technical problems resulted in an additional four (4) days of terminal "dwell" fees; as well as additional parallel demurrage fees (discussed further below) by Houston Bayport and/or Zim Respondents.

**70.**

The Houston Bayport Tariff No. 15 Subrule 095A mandates that "[accrued] Sustained Import Dwell Fee charges assessed against a unit must be paid before it leaves the Terminal gate."

**71.**

Ostensibly based on this tariff provision, compounding its unreasonable refusal to negotiate regarding the accrued Port Import Dwell Fees, Houston Bayport required payment of all Port Import Dwell Fees (including those resulting from its own technical delays) prior to allowing the Containers to be removed from the terminal; and, after confirming the Containers could be picked up between September 23 and 26, 2025, further advised that "dwell" charges would continue to accrue during that three-day pickup window.

24

**72.**

Accordingly, Complainants ultimately paid the full $917,458.74 amount of Port Import Dwell Fees via the Lynx Portal so that the Containers could be outgated.[27]

**73.**

As an MTO, Houston Bayport is subject to the provisions of the FMC's D&D Rule and regulations at 46 C.F.R. §§ 541.1 *et seq.* with regard to D&D invoicing; as well as the D&D Rule and 46 C.F.R. § 545.5.

**74.**

Likewise, the Port Import Dwell Fee charges imposed by Houston Bayport fall within the FMC's definition of "[d]emurrage or detention" because they constitute "charges…assessed by [an MTO] . . . related to the use of marine terminal space (e.g., land) or shipping containers, but not including freight charges."[28]

**75.**

Accordingly, Houston Bayport was obligated to satisfy the FMC requirements for "properly issued invoices" (45 C.F.R. § 541.4) that included the "required information" mandated under 46 C.F.R. § 541.5 and 541.6; absent which the Port Import Dwell Fee charges were not required to have been paid (*see* 46 C.F.R. § 541.5).

**76.**

Contrary to these requirements, Houston Bayport **did not issue any invoices** (only real-time online Lynx Portal charges) as required under 46 C.F.R. Part 541; and as such did not comply with any of the "required information" provisions of 46 C.F.R. § 541.6 and 46 U.S.C.

---

[27] *See* Exhibit 9 (Lynx system printouts/payment proofs).

[28] 46 C.F.R. 541.3.

25

§ 41104(a)(15), including without limitation failing to include the applicable tariff rule pursuant to which the "dwell" charges were accruing; failing to provide dispute information (as reflected in Complainants' difficulties in contacting Houston Bayport to discuss the disputed "dwell" charges); and failing to issue invoices within thirty (30) calendar days from the date the "dwell" charges were incurred as required under 46 C.F.R. § 541.7.  These violations eliminated any obligation of Complainants to pay the invalid Port Import Dwell Fees pursuant to 46 C.F.R. § 541.5 and § 541.7.[29]

    a.  Indeed, it is Houston Bayport's express policy regarding the Port Import Dwell Fees that **"[n]o invoices will be sent**" with respect to such fees.[30]  This is an explicit policy that violates the FMC's regulations at 46 C.F.R. Part 541 and 46 U.S.C. §41104(a)(15).

    b.  Additionally, Houston Bayport Tariff No. 15, Subrule 095A (*see* ¶¶59-61 *supra*), as well as Houston Bayport's online express policy,[31] limits the imposition of the "SUSTAINED IMPORT DWELL FEES" that comprise the Port Import Dwell *solely to "loaded import containers*." The Containers in this case were not "loaded import containers" and were not loaded with any cargo, but were rather bespoke, highly specialized/modified Containers.  There is no comparable "dwell" fee

---

[29] *See Brooke Gibson v. Formula Glob. Mobility*, Dkt. No. 2030(I), 2026 FMC LEXIS 203 * (SCO Mar. 27, 2026) (initial decision)  ("[T]he Commission has emphasized that 46 U.S.C. § 41104(f) "functions to void an invoice if a single required element is not included." 89 Fed. Reg. at 14,335. Here, multiple elements are missing, resulting in the elimination of Claimant's obligation to pay the applicable charges. Claimant paid the fees to secure the release of her goods; accordingly, Claimant is entitled to a refund for the payment.").

[30] https://porthouston.com/wp-content/uploads/2025/06/2025_Dwell-Fees.pdf.

[31] *Id.*

26

provision in Houston Bayport Tariff No. 15 that would apply to a category of asset like the Containers. Accordingly, the Containers do not fall within the scope of the charges that Houston Bayport imposed vis-à-vis the Port Import Dwell Fees.

**77.**

At all times during which Houston Bayport was accruing "dwell" fees for the Containers, including without limitation all delays attributable to the terminal's own non-responsiveness and technical issues, it remained impossible for Complainants to move any of the Containers from the Houston Bayport terminal due to the ongoing CBP hold/detention, and any demurrage/"dwell" charges assessed during this timeframe were not serving the incentive principle framework mandated under the Shipping Act and FMC regulations and contemplated under Houston Bayport's own tariff and policy terms, including its own guidance indicating that such "dwell" fees are intended to "to further encourage container movement."[32]

**78.**

Additionally, Houston Bayport's delays and unreasonable conduct caused additional demurrage days to accrue with respect to the Zim Respondents (as explained below, *see e.g.* ¶¶107-08) for days during which Houston Bayport's conduct prevented outgating of the Containers.

**79.**

Further, Houston Bayport's imposition of Port Import Dwell Fees **together with** terminal "demurrage" charges is an unjust and unreasonable practice, in violation of 46 U.S.C. § 41102(c), the D&D Rule, 46 C.F.R. § 545.5, and the incentive principle insofar as the "dwell" fees are unjustly duplicative of terminal "demurrage" charges separately charged for the Containers. In short, Houston Bayport Tariff No. 15, Subrule 095A mandating that "dwell" fees are to be

---

[32] *Id.*

27

"charged in addition to the demurrage for loaded import containers" (which *does not include* the bespoke Containers) fundamentally violates 46 U.S.C. § 41102(c), the D&D Rule, 46 C.F.R. § 545.5, and the incentive principle.

**80.**

The FMC (in commentary responses during rulemaking for the D&D Rule) has addressed these sort of duplicative "dwell" fees and confirmed that they are subject to the reasonableness requirements of 46 U.S.C. § 41102(c) as well as the D&D Rule, 46 C.F.R. § 545.5, and the incentive principle:

> [D]well fees [similar to those in Bayport Terminal Tariff No. 15] are subject to the general prohibition contained in 46 U.S.C. § 41102(c) against failure "to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property." Therefore, when these fees are charged to a shipper, the Commission's interpretive rule on demurrage and detention contained in 46 C.F.R. § 545.5 applies. The interpretative rule broadly defines demurrage to include any charges assessed that relate to the use of marine terminal space. It is the purpose of the fee, not the label or title, that is controlling. [Dwell fees like those in Bayport Terminal Tariff No. 15] meet this definition of demurrage. Further, the interpretative rule made clear that it applies when these types of fees are imposed on shippers by a[n] [MTO] or an ocean common carrier.
>
> The reasonableness of the dwell fees is evaluated against the standard in [Section] 41102(c) and the interpretative rule. The reasonableness of demurrage practices will be assessed against the ability to serve their primary purpose as financial incentives to promote freight fluidity. . . . [D]well fees are governed by the incentive principle of the interpretative rule.[33]

Despite this clear directive, Houston Bayport's express policy explicitly states "[n]o invoices will be sent" for its "dwell" fees, which is a clear violation of the requirement at 46 C.F.R. §541.7 that

---

[33] June 30, 2022 FMC Response to Recommendation 1 from the National Shipper Advisory Committee (NSAC) submitted on May 6, 2022 a*vailable at* https://www.fmc.gov/wp-content/uploads/2022/06/NSACRecommen dation1_no_sign.pdf.

a "billing party" (like Houston Bayport in its capacity as an MTO, *see* 46 C.F.R. §541.3) "must

issue a demurrage or detention invoice within thirty (30) calendar days from the date on which the

charge was last incurred."

**81.**

Further, Houston Bayport's improper Port Import Dwell Fee charges violate the D&D

Rule, 46 C.F.R. § 545.5, and the incentive principle.  Specifically, those charges do not in any way

"serv[e] t[he] intended primary purposes [of demurrage charges] as financial incentives to promote

freight fluidity"[34] nor do they comport with its own guidance indicating that such "dwell" fees are

intended to "to further encourage container movement," particularly when the Containers were not

"loaded import containers" as contemplated under the tariff/policy.[35]

**82.**

As set forth in the preceding allegations, for *all days* during which the Port Import Dwell

Fee charges accrued, **it was not possible for the Containers to be removed from the Houston

Bayport terminal**, due variously to a combination of factors all beyond the reasonable control of

Complainants and its agents/intermediaries, including without limitation lack of information/

responses from CBP, CBP delays, reasonable time required to satisfy CBP requirements/inquiries,

and delays resulting from Houston Bayport's non-responsiveness/technical issues.

**83.**

Further, CBP's initial hold, formal detention, and continued and varied unreasonable

refusal/delays in resolving the CBP Entry issues, as well as the delays/unreasonable actions of

Houston Bayport vis-à-vis the invalid "dwell" charges,  were not attributable to any fault or neglect

---

[34]  46 C.F.R. § 545.5(c).

[35] https://porthouston.com/wp-content/uploads/2025/06/2025_Dwell-Fees.pdf.

#111642637v5

of Complainants; and no action/inaction by or on behalf of Complainants constituted an unreasonable or negligent failure to comply with an importer's "customary responsibilities… [such as] submitting complete, accurate, and timely paperwork."[36]  Complainants made all required declarations, consistent with prior entries for substantially identical containers, and at valuations consistent with the preferred CBP "transaction value" metric under 19 U.S.C. § 1401a.

### 84.

Complainants' conduct with respect to submitting all required declarations to CBP for the Containers was reasonable and diligent, and the issues (improperly and unreasonably) raised by CBP were intrinsic to the unique nature of the Containers as self-contained modular assets.

### 85.

In fact, as a practical matter, Complainants ultimately *prevailed* on its position regarding entry of the Containers at a lower value (subject to CBP's right to pursue higher valuation against the bond); and in fact, the re-classification process resulted in **lower provisional dutiable value** for the Containers. Furthermore, one of the entries has already liquidated, finalizing (for that entry) CBP's acceptance of the lower valuation. In short, Complainants' conduct at all times was not only reasonable and diligent, it eventually resulted in a provisional net benefit to Complainants with respect to the CBP's acceptance of lower valuation (albeit subject to a continuous bond should CBP elect to pursue higher value) based on updated classification codes.

### 86.

Given the unique nature of the Containers (which were not "loaded import containers" under Houston Bayport's tariff/policy), as well as the practical commercial concern of ensuring that anticipated future import of similar modules would be properly and efficiently handled,

---

[36]  *See* 85 Fed. Reg. 29,638, 29,659 (May 18, 2020).

Exhibit 1

Complainants' conduct was legally and commercially reasonable and validated by the outcome, and thus constituted "extenuating circumstances" under 46 C.F.R. § 545.5(c)(iv) that render Houston Bayport's Port Import Dwell Fee charges (which under Houston Bayport policy were never invoiced in plain violation of FMC regulations) unreasonable.

## 87.

Further, Houston Bayport's unreasonable and continuing practice of accruing Port Import Dwell Fee charges while Complainants were diligently pursuing reasonable and appropriate legal relief with CBP (as evidenced by the net beneficial ultimate outcome of the valuation/classification issues that triggered the CBP hold/detention) acted as a potential disincentive for Complainants to pursue otherwise valid rights to contest CBP's unreasonable and improper actions regarding the Containers.

## 88.

In other words, Houston Bayport's unreasonable decision to continue accruing unreasonable Port Import Dwell Fee charges put improper and unjust commercial pressure on Complainants to simply *give up its otherwise valid legal rights* regarding the CBP valuation/ classification dispute. Complainants chose not to acquiesce to these unjust commercial pressures, and instead successfully pursued and ultimately validated its rights pursuant to the net-favorable resolution with CBP. This dynamic (i.e. the unjust effect of Houston Bayport's Port Import Dwell Fee charges disincentivizing Complainants' pursuit of good faith disputes as to valid legal rights) further constituted "extenuating circumstances" under 46 C.F.R. § 545.5(c)(iv) that render Houston Bayport's the Port Import Dwell Fee charges unreasonable.

31

**89.**

Additionally, to the extent all Houston Bayport's Port Import Dwell Fee charges are attributable to CBP's unreasonable non-responsiveness and delays, as well as its unreasonable unilateral decision to treat substantially identical entries differently combined with its unreasonable refusal/delay in resolving issues as to those entries, CBP's conduct constitutes "extenuating circumstances" under 46 C.F.R. § 545.5(c)(iv) that render Houston Bayport's the Port Import Dwell Fee charges unreasonable; and also rendered those charges incapable of "serving their intended purposes" of "promot[ing] freight fluidity" (or Houston Bayport's own guidance indicating that such "dwell" fees are intended to "to further encourage container movement"[37]) because the Containers *could not possibly have been removed* during the time periods noted above and included in the Port Import Dwell Fee charges paid by/on behalf of Complainants.

**90.**

Further, the FMC has acknowledged (in the context of rejecting proposals for demurrage charges to be freely allowed during pendency of government inspections) that "[t]here are numerous incentives other than avoiding demurrage that motivate shippers to avoid or minimize government inspections… [including] examination costs… [and] delay[ing] cargo from reaching its destination;" as well as the fact that shippers' "control over an inspection is limited… nor can they exert much control of the timeliness of examinations."[38]

---

[37] https://porthouston.com/wp-content/uploads/2025/06/2025_Dwell-Fees.pdf.

[38] D&D Rule, 85 Fed. Reg. 29,638, 29,659 (May 18, 2020).

#111642637v5

**91.**

The preceding allegations exemplify how no amount of demurrage-based charges could possibly have increased freight fluidity in these circumstances.  Specifically, SunnySide submitted an August 25, 2025 request  for waiver of the accrued Port Import Dwell Fees being charged by Houston Bayport, which totaled (at that time) $820,125.45, on the basis that they were improperly charged (inter alia) under 46 C.F.R. § 545.5/the D&D Rule in light of CBP's unreasonable hold/detention and delays in resolving the situation.  Houston Bayport refused, and continued to accrue the charges through September 22, 2025.  This confirms that, whether the Port Import Dwell Fee Charges (finalized in late September) had been charged in June, July, or August, would not have made any difference because the Containers *could not move* during any of those time frames, and due to no unreasonable conduct or fault of Complainants .

**H.    Invalid Demurrage Charges by Zim Respondence and/or Houston Bayport**

**92.**

The Containers were ultimately removed/outgated from Houston Bayport on or about September 23, 2025 after CBP released them upon approval of the bond and after all (invalid) "dwell" fees were paid (but not owed) pursuant to Houston Bayport's condition that all amounts be paid before they would allow the Containers to be removed.

**93.**

However, seven days later on September 29, 2025 (a week after all the Containers had been removed from the Houston Bayport terminal), Zim US issued the seven (7) Zim Demurrage Invoices to TD Logistics,[39] regarding 138 of the 147 Containers (excluding the 9 that were

---

[39] Exhibit 10.

33

removed to CES), totaling $7,050,260 of accrued demurrage pursuant to the Zim Tariff (and specifically Zim Respondents' Tariff # ZIMU-136 incorporated in the Zim Tariff).

**94.**

The demurrage charges reflected in the Zim Demurrage Invoices are nearly **two times the transaction purchase price value** of the Containers provisionally accepted by CBP—i.e. the Zim Respondents' demurrage charges **cost more than the Containers themselves**.[40]

**95.**

As with the prior CES Demurrage Invoices, the Zim Demurrage Invoices also violated 46 C.F.R. § 541.6(a)(4) and 46 U.S.C. § 41104(a)(15) because they do not identify "[t]he basis for why the billed party [TD Logistics] is the proper party of interest" for the charges. Accordingly, the demurrage charges reflected in the CES Demurrage Invoices were not required to be paid pursuant to 46 C.F.R. § 541.5.

**96.**

Further, the Zim Demurrage Invoices violate the D&D Rule, 46 U.S.C. § 41104(a)(14), 46 C.F.R. § 545.5, and the incentive principle. Specifically, the demurrage charges reflected in the Zim Demurrage Invoices do not in any way "serv[e] t[he] intended primary purposes [of demurrage charges] as financial incentives to promote freight fluidity."[41]

---

[40] DQS has reserved all rights to dispute any efforts by CBP to impose a higher valuation than the ones provisionally accepted by CBP (subject to bond). At this point, CBP has not further pursued any higher valuation, and in fact one of the updated entries (at the provisionally accepted *lower* valuation) has since liquidated, with the rest still pending liquidation as of the date of this submission.

[41] 46 C.F.R. § 545.5(c).

34

### i. Absence of Tariff Terms/Rate for Demurrage on Shipper-Owned/Specialized Containers violates 46 U.S.C. § 40501(a)(1), (b)(4)

**97.**

First and most simply, the Containers were at all times **shipper-owned containers—**i.e. not containers owned or leased by the Zim Respondents—and thus there can be no justified opportunity cost component of the Zim Demurrage Invoice charges relating to use of the containers.

**98.**

The Zim Tariff (ZIMU-480 – "TRANSPACIFIC EB [East Bound] RULES TARIFF") cross-references and incorporates a *different* Zim tariff (ZIMU-136 – "EQUIPMENT INTERCHANGE TARIFF" and specifically Rule 4.0 of ZIMU-136) with respect to the rule for free time and demurrage in the Zim Tariff.[42]

a. The *general scope* of this cross-referenced ZIMU-136 **is exclusively limited to Zim-owned "Equipment"** (defined as "Equipment commonly used in the road transport of intermodal freight including trailers, chassis, containers and associated devices"[43]) **being exchanged in the United States:** "RULES AND CHARGES IDENTIFIED HEREIN ARE APPLICABLE TO ALL USEAGE OF ZIM EQUIPMENT INTERCHANGED WITHIN THE U.S."[44]

b. In turn, the cross-referenced/incorporated Rule 4.0 of ZIMU-136 in the applicable TRANSPACIFIC EB Tariff ZIMU-480 only provides free time/demurrage rates for Zim-owned containers within the general scope of ZIMU-136—i.e. Zim-owned containers/equipment.

c. The free time and demurrage rates, on the face of the tariff terms, do not apply to shipper-owned containers; and are derived from commercial and economic concerns unique to Zim-owned containers (i.e. Zim's own use of its containers for future cargo movements with other customers), and specific to "equipment interchange"

---

[42] *See* Zim Tariff Rule No. 023, Subrule No. 01 (Rule Name: "FREE TIME AND DEMURRAGE AT DESTINATION (CY/CY AND CFS/CY"; Rule text: "MOVED TO ZIMU-136, RULE 4.0").

[43] ZIMU-136, Rule No. 002-0, § 4.

[44] ZIMU-136, Rule No. 001-0.

circumstances in which Zim's containers must be returned so that Zim can reuse them to carry other customers' cargo and earn future freight.[45]

d.  The commercial considerations and justifications underlying any demurrage rates related to Zim-owned containers, including considerations relating to freight fluidity, are **fundamentally distinct** from any similar considerations for non-Zim owned containers, which are not being returned to freight/cargo service and in which Zim has no beneficial interest.

**99.**

However, the Zim Tariff applicable to the Containers (i.e. ZIMU-480) expressly allows for carriage of "Merchant supplied/owned containers," but specifies that such "Merchant supplied/owned containers **will be subject to all Tariff rates, terms, conditions and ancillary charges…** [except for, in pertinent part] container detention charges."[46]  Accordingly, the Zim Tariff purports to apply the same demurrage rates to shipper-owned containers/specialized non-cargo containers as it does for Zim-owned cargo containers, *despite* the fundamental commercial and logistical differences between these two categories of containers.

**100.**

Further, the Zim Tariff elsewhere specifies that all tariff rates in the Zim Tariff "[a]pply to **cargo stowed in standard dry van containers** [Container] Y[ard]/[Container] Y[ard] movement only, and are not applicable to cargo stowed in special equipment, such as, but not limited to upgraded 20-foot containers, open top containers, hi-cube containers, flat rack, ventilated type

---

[45]  *See, e.g.*, NY NJ Foreign Freight Forwarders & Brokers Ass'n, Inc., *Comments on Advanced Notice of Proposed Rulemaking regarding Demurrage and Detention Billing Requirements*, Dkt. No. 22-04  2021 FMC LEXIS 237, *11 (Apr. 16, 2021) ("Demurrage paid to a VOCC traditionally comprised the cost for the terminal space, the rental cost for the use of the container after the free time, and the opportunity cost of not being able to use the container to generate revenue."), https://www2.fmc.gov/readingroom/docs/22-04/22-04_Comments_NYNJFFF&BA.pdf/; *see also* Zim knew the containers were shipper-owned as identified on the Zim BLs (Ex. 1).

[46] Zim Tariff, Rule No. 2, Subrule No. 06B (emphasis added).

36

containers used solely for carriage of liquids or compressed gases and non-containerized cargo."[47]

The bespoke, highly specialized/modified Containers *do not fall within this scope;* and thus by their own terms, the "Tariff Rates" set forth in the Zim Tariff—including the cross-referenced demurrage rates from ZIMU-136—*do not apply* to the non-Zim-owned, non-cargo-carrying, specialized Containers.

**101.**

As an FMC-regulated VOCC, Zim is mandated by statute to maintain a publicly accessible tariff "showing all its rates, charges, classifications, rules, and practices," and specifically "stat[ing] separately each terminal or other charge, privilege, or facility under the control of the carrier or conference and any rules that in any way change, affect, or determine any part or the total of the rates or charges." 46 U.S.C. § 40501(a)(1), (b)(4); 46 C.F.R. § 520.4(a)(4). Further, VOCC tariffs must be "clear and definite" (46 C.F.R. § 520.7(a)(1)); and "[l]ist each classification of cargo in use" (46 C.F.R. § 520.4(a)(2)).

**102.**

Under very recent FMC authority, failure to publish a separate demurrage rate for a unique container type, and one that is operationally distinct and presenting different cost/economic factors

---

[47] Zim Tariff, Rule No. 2 (Rule Name "Application of Rates and Charges").

37

from other container types, is a violation of Section 40501(a)(1); (b)(2), (4),[48] which is a strict liability provision.[49]

**103.**

The fundamental purpose of Section 40501's requirement for specification of terms that "in any way change, affect, or determine any part or the total of the rates or charges" in a tariff is protection of shippers:

> Perhaps nothing is more important to effective protection of the shipping public and industry than the requirement that carriers file their tariffs and adhere to them strictly…. The enforcement of these laws goes to the very heart of the Commission's responsibilities, and the Commission and courts have long recognized the extreme importance of these laws….
>
> The purpose of requiring the submission of tariff schedules [under Section 40501] is to secure uniformity and equality of treatment in rates and services to all shippers. The requirement of the act that all rates should be published is perhaps the chief feature of the scheme provided for the effective outlawing of all discriminations. If this portion of the act is not strictly enforced, the entire basis of effective regulation will be lost….

---

[48] *MSC MEDITERRANEAN SHIPPING CO. S.A. – POSSIBLE VIOLATIONS OF THE SHIPPING ACT, 46 U.S.C. §§ 41102(C), 40501, AND 41104(a)(2)(A)*, 2026 FMC LEXIS 14, *9 (Jan. 6. 2026; FMC), Dkt. No. 23-08 (hereafter "*MSC 40501 Ruling*") (affirming Section 40501 violation because VOCC's tariff failed to have a separate, clearly delineated tariff demurrage rate for *non-operating* reefer containers (NORs), and instead only specified an *operating* reefer container demurrage rate, resulting in "unreasonable charges for NORs, which do not require the enhanced care operating reefers do"). *See also MSC MEDITERRANEAN SHIPPING CO. S.A. – POSSIBLE VIOLATIONS OF THE SHIPPING ACT, 46 U.S.C. §§ 41102(C), 40501, AND 41104(a)(2)(A)*, 2025 FMC LEXIS 163, *34-35 (ALJ Feb. 25, 2025); Dkt. No. 23-08 (hereafter "*MSC ALJ Initial Decision*") ("NOR containers that are used to carry dry cargo do not require such enhanced care (i.e. plugging and unplugging of the units, daily monitoring, electricity, pre-trip inspections for the units and generator, and fuel for the generators).").

[49] Section 40501 violations are strict liability violations with no "regard to intent" of the carrier. *Marcella Shipping Co.,* 28 F.M.C. 259, 266 (ALJ 1986); *see also Cari Cargo Int'l, Inc. Jorge Villena and Sea Trade Shipping*, 28 F.M.C. 395, 410 (ALJ 1986) (discussing how a VOCC "can violate [Section 40501] merely by operating without a tariff and by not adhering to its tariff regardless of its knowledge or reasons because these laws are 'absolute liability statutes.'")

38

> So important is the requirement that common carriers must file their tariffs and strictly adhere to them that the courts have long held that tariffs have the force and effect of law and that departure from them is not permitted even if hardship results in some cases or the carrier intended no harm…. Therefore [Section 40501 is] violated even if the carrier acted without fault.[50]

**104.**

Zim's failure to include a specific tariff rule for shipper-owned containers like the Containers subject to this Complaint constitutes a violation of Section 40501. The incompleteness of the Zim Tariff with respect to the Containers constitutes a failure to "state separately . . . any rules that in any way change, affect, or determine any part or the total of the rates or charges" under the FMC's recent decision in the *MSC 40501 Ruling*. Likewise, Zim's conduct in invoicing these demurrage charges that are not specified in Zim's tariff constitutes an unjust and unreasonable practice in violation of 46 U.S.C. § 41102(c), § 41104(a)(2)(A), § 41104(a)(4), § 41104(a)(14) & (15), § 41104(a)(15)(A) & (B) and/or § 41104(d), as well as 46 C.F.R. Part 541 and 46 C.F.R. §§ 545.4 and 545.5 and the D&D Rule.

**105.**

Shipper-owned containers like the Containers are not equivalent to carrier-owned containers or Dry Van Containers. Shipper-owned containers do not involve the same operational and commercial cost factors with respect to demurrage as standard Zim-owned cargo containers involved in interchange cargo trade. Zim Respondents have no lost opportunity cost dynamic for shipper-owned containers because Zim is not awaiting return of such containers to ship other customers' cargo.

---

[50] *Cari Cargo Int'l, Inc. Jorge Villena and Sea Trade Shipping*, 28 F.M.C. 395, 406-07 (ALJ 1986).

39

#111642637v5

**106.**

In this regard, "a charge [imposed by a VOCC] is unreasonable if it is not reasonably related, either to an actual service performed for, or a benefit conferred upon, the person being charged."[51] Here, Zim's non-tariff-specified demurrage charges for the shipper-owned Containers do not relate to an actual service performed or benefit conferred upon Complainants, and are therefore unreasonable.

### ii.    Zim's Demurrage Charges Violated 46 U.S.C. § 41104(a)(14) and the Incentive Principle, as outlined in 46 C.F.R. § 545.5

**107.**

Further, as set forth in the preceding allegations, for *all days* during which the Zim Demurrage Invoices (as well as the CES Demurrage Invoices) seek to charge Zim Tariff demurrage, **it was not possible for the Containers to be removed from the Houston Bayport terminal**, due variously to a combination of factors all beyond the reasonable control of Complainants, including without limitation lack of information/responses from CBP, CBP delays, reasonable time required to satisfy CBP requirements/inquiries, and delays resulting from Houston Bayport's non-responsiveness/technical issues and parallel and improper Port Import Dwell Fees.

**108.**

Further, CBP's initial hold, formal detention, and continued and varied unreasonable refusal/delays in resolving the CBP Entry issues, as well as the delays/unreasonable actions of Houston Bayport vis-à-vis the invalid "dwell" charges, were not attributable to any fault or neglect of Complainants; and no action/inaction by or on behalf of Complainants constituted an unreasonable or negligent failure to comply with an importer's "customary responsibilities… [such

---

[51]   *Kawasaki Kisen Kaisha, Ltd v. The Port Auth. of N.Y. and N.J.*, Dkt.No. 11-12, 2014 FMC LEXIS 36, *19, 2014 WL 7328475 (FMC Nov. 20, 2014).

40

as] submitting complete, accurate, and timely paperwork."[52]  Complainants submitted all required

documentation, consistent with prior entries for substantially identical containers, and at valuations

consistent with the preferred CBP "transaction value" metric under 19 U.S.C. § 1401a.

**109.**

In this regard, the Zim Demurrage Invoices also violated Zim's website guidance that, "[a]s

a general matter, ZIM suspends such charges in circumstances where interchange . . . is precluded

by circumstances beyond the reasonable control of the Merchant."[53]

**110.**

The conduct of Complainants with respect to submitting complete and accurate

documentation to CBP for the Containers was reasonable and diligent, and the issues (improperly

and unreasonably) raised by CBP were intrinsic to the unique nature of the Containers as self-

contained modular assets.

**111.**

In fact, as a practical matter, Complainants ultimately *prevailed* on its position regarding

entry of the Containers at a lower value (subject to CBP's right to pursue higher valuation against

the bond); and in fact, the re-classification process resulted in **lower provisional dutiable value**

---

[52]  *See* 85 Fed. Reg. 29,638, 29,659 (May 18, 2020). *See also Samsung Electronics Am., Inc., v. SM Line Corp.*, Dkt. No. 23-01, 2025 FMC LEXIS 398, *113 (ALJ May 28, 2025) ("Where no party is at fault and neither party can be incentivized to act, the imposition of detention and demurrage is likely unreasonable.").

[53]  *See*  https://www.zim.com/global-network/americas/usa/demurrage-detention-practices). Moreover, this "general" statement on Zim's website is at odds with Zim's demurrage tariff rule (Rule 4.0 of ZIMU-136), which provides *without exception* that "[i]f cargo is detained because of a customs hold or other government inspection either at the discharge port or transferred to an off-site location for examination and later returned to the terminal or another inland location under carrier responsibility, demurrage charges will apply for the full period following the expiration of free time until the termination event outlined in 4.a."

41

for the Containers. Furthermore, one of the entries has already liquidated. In short, Complainants' conduct at all times was not only reasonable and diligent, it eventually resulted in a provisional net benefit to Complainants with respect to the CBP's acceptance of lower valuation (albeit subject to a continuous bond should CBP elect to pursue higher value) based on updated classification codes.

## 112.

Given the unique nature of the Containers, as well as the practical commercial concern of ensuring that anticipated future import of similar modules would be properly and efficiently handled, Complainants' conduct was legally and commercially reasonable and validated by the outcome, and thus constituted "extenuating circumstances" under 46 C.F.R. § 545.5(c)(iv) that render the Zim Demurrage Invoices charges unreasonable.

## 113.

Further, Zim's unreasonable and continuing practice of accruing demurrage charges while Complainants were diligently pursuing reasonable and appropriate legal relief with CBP (as evidenced by the net beneficial ultimate outcome of the valuation/classification issues that triggered the CBP hold/detention) acted as a potential disincentive for Complainants to pursue otherwise valid rights to contest CBP's unreasonable and invalid actions regarding the Containers.

## 114.

In other words, Zim's unreasonable decision to continue accruing unreasonable demurrage charges—ultimately totaling *more than the Containers' commercial value*—put improper and unjust commercial pressure on Complainants to simply *give up otherwise valid legal rights* regarding the CBP valuation/classification dispute. Complainants chose not to acquiesce to these unjust commercial pressures, and instead successfully pursued and ultimately validated its rights

42

#111642637v5

pursuant to the net-favorable resolution with CBP. Complainants' actions in this regard were consistent with the FMC's "general principle [stated in the context of prevailing party attorney fee awards under 46 C.F.R. § 502.254, that] parties should be encouraged to litigate meritorious claims and defenses,"[54] and that complainants "who raise non-frivolous claims in good faith, who litigate zealously but within the rules and for proper purposes" should not be punished "in a way that would chill the filing of credible claims and defenses."[55] This dynamic (i.e. the unjust effect of Zim demurrage charges disincentivizing Complainants' pursuit of good faith, meritorious disputes as to valid legal rights) further constituted "extenuating circumstances" under 46 C.F.R. § 545.5(c)(iv) that render the Zim Demurrage Invoices charges unreasonable.

    a. Zim Respondents' response ("**Zim Dispute Response**") to the October 22 and 29 formal dispute letters submitted via the designated "Zim Dispute Portal" exemplifies their cavalier treatment of Complainants' rights and the reasonable grounds/ extenuating circumstances at issue with respect to the Containers:

> If your client had been convinced that the Shipments were the subject of an CBP error or oversight, it is extraordinary that it took 48 days to instruct counsel and formulate a response… A customs hold would not have occurred but for your client completing paperwork properly by describing the cargo/containers and accurately declaring value. The only plausible explanation is that your client simply did not comply with its customary obligations, and so it would be difficult for your client to show that the application of demurrage charges were unreasonable. The extenuating circumstances are sloppy and untimely customs declaration(s), and avoiding demurrage charges would be akin to penalizing ZIM because of your client's oversight.[56]

---

[54] 81 Fed. Reg. 10,508, 10,515 (Mar. 1, 2016).

[55] FMC , *Statement of the Commission on Att'y Fees,* Dkt. No. 21-14, 2021 FMC LEXIS 223, *8 (Dec. 28, 2021), www2.fmc.gov/ReadingRoom/docs/21-14/21-14_Policy_Atty_Fees.pdf/.

[56] Exhibit 13.

#111642637v5

Exhibit 1

b.  This strident response ignores the fact that it was CBP non-responsiveness/delays – *not any conduct of Complainants* – that led to the extensive immobility of the Containers; and Zim Respondent's dismissive suggestion of "sloppy" customs compliance efforts ignores that those efforts ultimately **proved to be directly effective** in reducing the valuation for which Complainants were ultimately responsible, thus validating Complainants' pursuit of good faith, meritorious disputes as to valid legal rights.

c.  The dismissive approach in the Zim Dispute Response is characteristic of Zim Respondents' unreasonable, unjust and unfair conduct in this matter.

**115.**

Additionally, to the extent all the demurrage days reflected in the Zim Demurrage Invoices are attributable to CBP's unreasonable non-responsiveness and delays, as well as its unreasonable unilateral decision to treat substantially identical entries differently combined with its unreasonable refusal/delay in resolving issues as to those entries, CBP's conduct constitutes "extenuating circumstances" under 46 C.F.R. § 545.5(c)(iv) that render the Zim Demurrage Invoice charges unreasonable; and also rendered those demurrage charges incapable of "serving their intended purposes" of "promot[ing] freight fluidity" because the Containers *could not possibly have been removed* during the time periods noted above and included in the demurrage periods which Zim seeks to collect in the Zim Demurrage Invoices.

**116.**

Further, the FMC has acknowledged (in the context of rejecting proposals for demurrage charges to be freely allowed during pendency of government inspections) that "[t]here are numerous incentives other than avoiding demurrage that motivate shippers to avoid or minimize government inspections… [including] examination costs… [and] delay[ing] cargo from reaching

44

its destination;" as well as the fact that shippers' "control over an inspection is limited… nor can they exert much control of the timeliness of examinations."[57]  Likewise, the FMC has upheld the viability of Shipping Act claims based on unfair and unreasonable imposition of demurrage charges during periods when imported cargo is held by CBP pending a factual dispute.[58]

### 117.

The preceding allegations exemplify how no amount of demurrage charges could possibly have increased freight fluidity in these circumstances.  The Zim Respondents issued the (improper) CES Demurrage Invoices on June 2, 2025 but they were not paid until August 25, 2025 because *paying those charges would still not have allowed release of the Containers* due to the ongoing unreasonable conduct of CBP and Houston Bayport.  Whether the later Zim Demurrage Charges (issued in late September) had been invoiced in June, July, or August would not have made any difference because the Containers *could not move* during any of those time frames, and due to no unreasonable conduct or fault of Complainants.

### I.      Dispute of Charges under 46 C.F.R. § 541.8.

### 118.

On October 22, 2026, Complainants (via DQS's parent entity—Elektron Energy Operations Ltd., ("**Elektron**"), through undersigned counsel), timely submitted within 30 days, a formal dispute letter to the invoice-designated "Zim Dispute Portal" and via

---

[57] D&D Rule, 85 Fed. Reg. 29,638, 29,659 (May 18, 2020).

[58] *See Acme Freight Servs. Corp. v. Total Terminals Int'l,* Dkt. No. 22-07,  2022 FMC LEXIS 216, *7 (ALJ, May 26, 2022) (denying motion to dismiss "[The] complaint alleges that 'the assessment of demurrage charges during the CBP hold on the Containers was inconsistent with the FMC's interpretative rule on demurrage and detention found at 46 C.F.R. § 545.5 and Section 41102(c) of the Shipping Act.' [ ]Whether these charges were appropriate under these circumstances will depend on the facts that are established.").

(BayportCustomerService@porthouston.com) asserting essentially the same grounds alleged in this Complaint for invalidity of the Port Import Dwell Fees.

**119.**

On October 23, 2025, Rachel Garcia, identified as a "Customer Service Coordinator" in the email signature, advised under-signed counsel to direct any demurrage disputes for Houston Bayport's Port Import Dwell Fees to ZIM USA Customer Service Import at us.service.imp@zim.com—where the disputes had already been filed.[59]

**120.**

After the Zim Respondents issued the invalid Zim Demurrage Invoices on September 29, 2025, Complainants (via DQS's parent entity—Elektron, through undersigned counsel) timely submitted (within 30 days on October 29, 2025) a formal dispute letter to the invoice-designated "Zim Dispute Portal," asserting essentially the same grounds alleged in this Complaint for invalidity of the CES Demurrage Invoices and the Zim Demurrage Invoices.

**J.      Zim Respondents' Numerous Unreasonable Actions after Issuance of the Zim Demurrage Invoices; Unreasonable/Retaliatory Lawsuits in Two Jurisdictions**

**121.**

Prior to these October 22 and 29 submissions, between October 10 and 11, 2025, Zim ISS notified Zim US that DQS (via Sunnyside) had paid all outstanding fees (i.e. the Port Import Dwell Fees) to Houston Bayport, and that the Containers were released for removal from the terminal; and advised Zim US that the "case should be closed."[60]

---

[59] Exhibit 11.

[60] Exhibit 12.

#111642637v5

**122.**

Ultimately, on October 15, 2025 Zim US advised TD Logistics that the fees paid to Houston Bayport were only "dwell" fees, which were different from the demurrage amounts in the Zim Demurrage Invoices.

**123.**

Notwithstanding this patent confusion even between the Zim Respondents regarding the Zim Demurrage Invoices, they responded to the formal dispute letter on November 13, 2025 with a lawsuit filed by Zim ISS in the U.S. District Court for the Southern District of New York against TD Logistics[61] ("**SDNY Suit**") demanding payment in full of the $7,050,260.00 charges reflected in the Zim Demurrage Invoices, which they assert constitutes "reasonable value of the services rendered by Zim" (without specifying what "services" justify "demurrage" charges worth two times the value of the cargo; and despite the fact that the Zim Demurrage Invoices *do not list any "services"* at all, and include only "demurrage" rate charges); as well as attorneys' fees and interest.[62]

**124.**

Zim ISS's filing of the SDNY Suit violated 46 C.F.R. § 541.8(b) (and thus 46 U.S.C.

---

[61] *Zim Integrated Shipping Services, Ltd. v. TD Logistics, Inc.*, Case No. 25-9492 (S.D.N.Y. Nov. 13, 2025 filing date).

[62] Zim's complaint in the SDNY Suit also includes a *quantum meruit* claim for the demurrage charges with respect to alleged "ocean transportation, equipment usage, storage, and related services" related to DQS's specialized containers. However, Zim has not alleged non-payment of freight charges for "ocean transportation"; nor has it alleged any facial basis for "equipment usage" charges because the specialized containers at issue **were not Zim-owned containers,** and thus there was no "usage" of any Zim equipment on which to base such charges. Thus, the Zim SDNY Suit on its face is an improper, unreasonable, and unjust effort to evade FMC jurisdiction over issues fundamentally and inherently subject to the FMC's jurisdiction under the Shipping Act with respect to demurrage charges.

§ 41104(a)(15)), which provides that "[i]f a billing party [like Zim Respondents] receives a fee mitigation, refund, or waiver request from a billed party, **the billing party must attempt to resolve the request within thirty (30) calendar days of receiving such a request**."[63]

**125.**

Zim ISS filed the SDNY Suit on November 13, 2025, *only fifteen (15) days* after the October 29, 2025 fee dispute. **This action by Zim ISS is objectively unreasonable to the extent it violates Section 541.8 and thus 46 U.S.C. § 41104(a)(15).**

**126.**

Further through the SDNY Suit, Zim ISS violates 46 U.S.C. § 41102(d)(2)(B) by retaliating against an OTI (effectively as a surrogate of Complainants—to which Zim ISS sent a copy of the SDNY Complaint in response to Complainants' D&D dispute) with a lawsuit following a demurrage dispute under 46 C.F.R. Part 541 and 46 U.S.C. § 41104 without completing the regulatory process for a dispute.

**127.**

Additionally, the SDNY Suit filed by Zim ISS constitutes an unjust and unreasonable practice insofar as the underlying disputes regarding demurrage charges vis-à-vis the Shipping Act and FMC regulations (as specified in the October 29, 2025 dispute submission to the Zim

---

[63] 46 C.F.R. § 541.8(b) (emphasis added). While the October 29, 2025 billing dispute was submitted on behalf of DQS's parent entity Elektron (and not TD Logistics), DQS qualifies as a "billed party" under 46 C.F.R. § 541.3, including (*inter alia*) insofar as DQS is a "person . . . who is responsible for the payment of any incurred demurrage or detention charge"; and also as a "consignee" under Section 541.3—i.e. an "ultimate recipient of the cargo [or] person to whom final delivery of the cargo is to be made"—which would (to the extent applicable) bring DQS within the "Merchant" definition in Zim's BLs. *See* Zim's BL Terms & Conditions *available at* https://www.zim.com/help/bl-terms-and-conditions).

48

Respondents) are within the exclusive jurisdiction of the FMC (as Zim Respondents should be well aware[64]).

**128.**

On the same date that it unreasonably filed the SDNY Suit in violation of Section 541.8, Zim ISS likewise responded via letter to undersigned counsel for Complainants rejecting all grounds asserted in the October 29, 2025 demurrage dispute letter and demanding payment in full of the $7,050,260.00 charges reflected in the Zim Demurrage Invoices by November 21, 2025.

**129.**

Subsequently, undersigned counsel for Complainants and Zim Respondents engaged in various telephone conferences in an effort to reach resolution regarding the CES Demurrage Invoice and Zim Demurrage Invoice charges, but to no avail.

**130.**

During these discussions, Zim Respondents indicated they had paid "storage" fees to Houston Bayport in relation to the Containers. Despite follow up, Zim Respondents have not clarified whether these "storage" fees they paid were distinct and different "storage" amounts

---

[64] *See Samsung Electronics America, Inc. v. ZIM Integrated Shipping Services, Inc.*, Dkt. No. 22-30 (ALJ Apr. 22, 2025) ("[T]he Commission must address allegations of violations of the Shipping Act, which are within its exclusive jurisdiction; no common law remedy exists for such violations."). The SDNY Suit is currently pending the court's decision on a motion to stay by TD Logistics (which the Court ordered to be filed on or before May 4, 2026), seeking a stay of Zim ISS's alleged common law contract claims on the basis of the FMC's exclusive jurisdiction (to the exclusion of the SDNY) to determine the validity and viability of Zim Respondents' invoicing and seeking payment from TD Logistics for the Zim Demurrage Invoice charges. *See* SDNY Suit, Case No. 1:25-cv-09492-AT, R. Doc. No. 37 (S.D.N.Y. May 4, 2026). Likewise, as referenced in support of the motion to stay, TD Logistics has submitted its own Charge Complaint (dated April 14, 2026) to the FMC (pursuant to 46 U.S.C. § 41310), challenging issuance of the Zim Demurrage Invoices to TD Logistics on the basis that TD Logistics (as mere notify party/destination agent) was not the proper party to be billed for demurrage. *See id.*, R. Doc. 37-1 through 37-3 (attachments to TD Logistics' motion to stay comprising its FMC charge complaint and FMC correspondence acknowledging same).

49

charged by Houston Bayport; or whether these were Houston Bayport "demurrage" charges (pursuant to Houston Bayport Tariff No. 15, Subrule 095/095A), with respect to which Zim Respondents would have been guarantors under the tariff terms, but which (again) *only apply to* "loaded import containers" and thus not to the Containers.[65]

**131.**

Nor have Zim respondents clarified whether the $7,050,260.00 charges reflected in the Zim Demurrage Invoices include or are somehow derivative (i.e. pass-throughs) of whatever Houston Bayport "storage" and/or terminal "demurrage" charges (improper vis-à-vis applicability solely to "loaded import containers") Zim Respondents have reportedly paid (other than to say that whatever charges they have paid are "contemplated in [their] demand."). However, again, the Zim Demurrage Invoices themselves *do not list any Houston Bayport terminal-derived charges* at all, and include only Zim Tariff "demurrage" rate charges). This is despite the fact that Zim's online demurrage guidance specifies (at least for some import terminal locations) when *terminal* storage/demurrage charges are charged separately from Zim demurrage.[66]

**132.**

To the extent the Zim Demurrage Invoices do in fact, or intend to, include pass-through charges that the Zim Respondents paid on behalf of the Containers to  Houston Bayport, the Zim

---

[65] *See* Houston Bayport Tariff No. 15, Subrule No. 095/095A; Subrule No. 056.4 ("The payment of all terminal and wharfage charges, set forth herein, shall be guaranteed to the Port Authority by the Vessel, notwithstanding that they are ultimately liabilities of the owner of the cargo, and the use of Port Authority facilities by the Vessel shall be deemed an acceptance and acknowledgement of this guarantee.").

[66]    *See*    https://www.zim.com/assets/xophb22h/usa-dd-rate-tables-effective-2026-01-01.pdf (identifying "split collection terminals" (in New York, Baltimore, Miami, Port Everglades) where "*[r]ates are inclusive of Carrier Demurrage only. Marine Terminal Operators will directly invoice storage/terminal demurrage charges as applicable.*" (italics original)).

50

#111642637v5

Demurrage Invoices violate 46 U.S.C. § 41104(a)(15) with respect to violations of 46 C.F.R. §§ 541.5 and 541.6(a)(4) (for failing to include the basis for why the billed party is the proper party viz. any pass-through charges); § 541.6(c)(2) (for failing to identify the pass-through basis of the charges); and § 541.6(e) (for invalidly certifying the Zim Demurrage Invoices to the extent any of the aforementioned pass-through charge information was omitted).

**133.**

This confusion regarding "dwell" fees versus Zim "demurrage" charges versus any Houston Bayport terminal "storage"/"demurrage" charges vaguely referred to by Zim, as evidenced in the conflicting correspondence between the Zim Respondents between October 10-15, 2025, creates the precise sort of confusion the D&D Rule prohibits, and that the FMC has further criticized in its recent rulemaking regarding "Demurrage and Detention Billing Requirements" addressing how VOCCs and MTOs issue charges:

> The [FMC in the D&D Final Rule] also supported defining demurrage and detention in terms of what asset is the source of the charge (land [Re: demurrage] or container [Re: detention]) as opposed to the location of a container (inside or outside a terminal). The [FMC] discouraged use of terms such as "storage" and "per diem" as synonyms for demurrage and detention because these terms add additional complexity and are apparently inconsistent with international practice… [I]f shippers do not know what a charge means, they cannot ascertain the nature of the charge and if it is justified [quotation omitted].[67]
>
> \*\*\*
>
> Requiring standardized practices from MTOs also addresses the confusion raised in comments about what actual role MTOs play in invoicing for demurrage and detention. Some MTOs told Congress that they do not issue their own demurrage and detention invoices separate from carriers. Some MTOs have told the Commission that they do not send traditional demurrage and detention invoices, but instead issue "demurrage receipts" or "disclose charges." One MTO

---

[67] D&D Rule, 85 Fed. Reg. 29,638, 29,663 (May 18, 2020).

51

contended to the Commission that it does not send demurrage and detention invoices to BCOs [beneficial cargo owners like DQS] or truckers, and that it is VOCCs who charge BCOs demurrage and detention; but the same MTO also said that MTOs sometimes collect demurrage and detention on behalf of VOCCs. Other MTOs said that they do send demurrage and detention invoices. Yet, even if these MTOs agreed that they do send demurrage and detention invoices, they disagreed with the idea that these invoices should be subject to the same regulation as other billing parties.

These inconsistent statements by MTOs highlight the need for clear rules governing all demurrage and detention billing parties so that billed parties receive accurate information to facilitate faster payment and dispute resolution. Allowing MTOs to escape the basic requirements of this rule by artfully styling their demurrage and detention invoices as "receipts" or "disclosures" would undermine the statute, frustrate the Commission's expressed intention to simplify and clarify demurrage and detention invoicing for billed parties, and leave in place the confusing status quo that spurred Congress to pass OSRA 2022.[68]

**134.**

This confusion further exemplifies and compounds the problem with Zim's failure to include a specific tariff rule for shipper-owned containers like the Containers constitutes a violation of Section 40501.  A properly specified and applied tariff term, with appropriately specific demurrage definitions for shipper-owned containers like the Containers, may have potentially clarified the basis for the charges Zim has improperly imposed in this case, or provided additional information for Complainants to determine whether or to what extent the charges were just and reasonable, as contemplated under the D&D Rule.[69]

---

[68] 89 Fed. Reg. 14,430, 14,334 (Feb. 26, 2024).

[69] *See* 46 C.F.R. § 545.5(e) ("*Transparent terminology.* The Commission may consider in the reasonableness analysis the extent to which regulated entities have clearly defined the terms used in demurrage and detention practices and regulations, the accessibility of definitions, and the extent to which the definitions differ from how the terms are used in other contexts.").

#111642637v5

**135.**

Notwithstanding these fundamental problems as to the nature/basis for the Zim Demurrage Invoices, and further compounding its retaliatory conduct with respect to the SDNY Suit against TD Logistics, Zim ISS has recently (April 15, 2026) filed **a second federal complaint** in the U.S. District Court for the Southern District of Texas (Case No. 26-cv-02995) ("**SD Tex Suit**") against Elektron (DQS's parent entity) seeking recovery of $708,153.00 in "terminal storage charges" that Zim ISS allegedly paid to Houston Bayport in respect of the Containers.

    a. Neither Zim ISS nor Zim US have identified or provided documentation detailing any of these alleged pass-through charges (which, presumably, are included within the charges in the Zim Demurrage Invoices, although, again, it is not clear).

    b. Nor does Houston Bayport Tariff No. 15 identify any "terminal storage charges" (as such) in relation to import containers/specialized cargo like the Containers.

    c. Regardless, because any such "terminal storage charges" incurred at Houston Bayport fall within the definition of "demurrage" under 46 C.F.R. § 541.3 and § 545.5, any claims relating to such charges—as is the case with Zim ISS's claims in the SDNY Suit—are necessarily and exclusively within the jurisdiction of the FMC and are not properly cognizable in the Southern District of Texas.

**136.**

The timing of Zim ISS's most recent (jurisdictionally improper) SD Tex Suit is telling. As noted above (FN 63), TD Logistics filed a Charge Complaint with the FMC pursuant to 46 U.S.C. § 41310 *on April 14, 2026*, challenging various aspects of the Zim Demurrage Invoice charges, including that they should have been issued to the "ultimate consignee" of the Containers (i.e. DQS, as explained at FN 63 *supra*). ***The very next day*** (**April 15, 2026), Zim ISS filed the SD**

53

Exhibit 1

**Tex Complaint**, seeking recovery of the above-discussed "terminal storage" charges against Elektron (DQS's parent) in federal court, despite the fact that Zim ISS was fully aware (based on the October 22 and/or 29, 2025 formal dispute letters submitted on behalf of Complainants via the "Zim Dispute Portal," *see* ¶¶118-120 *supra*) that Elektron (and/or the appropriate entities on its behalf) intended to challenge the Zim Demurrage Invoices (including any "storage" charges) before the FMC.

### 137.

Zim ISS's filing of the SD Tex Suit when the FMC has exclusive jurisdiction over the charges at issue—identically to its improper filing of the SDNY Suit—violates 46 U.S.C. § 41102(d)(2)(A), (B) by retaliating against Complainants (as shippers/agents of shippers) with a lawsuit (despite the FMC's exclusive jurisdiction) on the basis of the Complainants' demurrage dispute and following what it knew constituted an active demurrage dispute under 46 C.F.R. Part 541 and 46 U.S.C. § 41104.

### 138.

Zim's filing of the SD Tex Suit likewise constitutes additional and independent violations of the D&D Rule, the incentive principle, and the Shipping Act/OSRA.

a. First, Zim Respondents **have never issued an invoice** to Complainants (or Elektron, or TD Logistics, or any other party, as far as Complainants are aware) for the $708,153.00 at issue in the SD Tex Suit for alleged "terminal storage charges," which fall squarely within the definition of "demurrage" under 46 C.F.R. § 541.3 ("any charges, including 'per diem' charges, assessed by ocean common carriers, marine terminal operators, or non-vessel-operating common carriers related to the use of marine terminal space (e.g., land) or shipping containers, but not including freight charges") and § 545.5 ("any charges,

54

#111642637v5

including 'per diem,' assessed by ocean common carriers, marine terminal operators, or ocean transportation intermediaries ('regulated entities') related to the use of marine terminal space (e.g., land) or shipping containers, not including freight charges"). To the extent the $708,153.00 at issue in the SD Tex Suit may be included in the $7,050,260.00 total of the Zim Demurrage Invoices, there was never any discrete invoice issued for that separate amount, nor any specification within the Zim Demurrage Invoices breaking out and supporting that discrete amount with the specific dates the charges were incurred, nor providing any BL-specific or Container-specific basis for the charges, all as required under 46 C.F.R. § 541.6(a). Zim Respondents' failure to issue *any invoice at all* for these "terminal storage" demurrage charges before filing the SD Tex Suit violates 46 U.S.C. § 41104(a)(15) and (d), as well as 46 C.F.R. §§ 541.1-3 and 541.5-541.8. Accordingly, the demurrage charges reflected in the CES Demurrage Invoices were not required to be paid pursuant to Section 541.5.

b.  In turn, Zim Respondents also violated 46 C.F.R. § 541.7(a) and 46 U.S.C. § 41104(a)(15) because the "terminal storage" demurrage charges at issue in the SD Tex Suit (which were *never* invoiced at all) were not invoiced "within thirty (30) calendar days from the date on which the charge was last incurred" as required under these provisions. Accordingly, the "terminal storage" demurrage charges at issue are not required to be paid pursuant to Section 541.7(a).

c.  For the same reasons, Zim Respondents' filing of the SD Tex Suit without ever invoicing the "terminal storage" demurrage charges violates 46 U.S.C. § 41102(c) because it constitutes a failure "to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property."

#111642637v5

d.  Additionally, Zim Respondents' filing the SD Tex Suit without ever validly invoicing the "terminal storage" demurrage charges violated 46 C.F.R. § 541.8 by failing to provide "at least thirty (30) calendar days from the [non-existent] invoice issuance date to request mitigation… or waiver."

e.  Also, Zim Respondents' pursuit of the previously un-invoiced $708,153.00 "terminal storage" demurrage charges in the SD Tex Suit violates the Incentive Principle insofar as those charges were not discretely raised until more than seven months after the Containers had been outgated from the Houston Bayport facilities, and thus cannot possibly be "incentivizing" movement of the Containers.

f.  "[T]he Commission has emphasized that 46 U.S.C. [§] 41104(f) "functions to void an invoice if a single required element is not included." 89 Fed. Reg. at 14335. Here, multiple elements are missing, resulting in the elimination of Claimant[s'] obligation to pay the applicable charges."  *Gibson v. Formula Global Mobility,* Dkt. No. 2030(I), 2026 FMC LEXIS 203, *41 (SCO, Mar. 27, 2026).  Zim Respondents' failure to issue *any* invoice for the amounts at issue in the SD Tex Suit, much less one compliant with 46 U.S.C. § 41104(a)(15) and 46 C.F.R. Part 541, precludes any liability for payment of those amounts under 46 U.S.C. § 41104(f): "Failure to include the information required under subsection (d) on an invoice with any demurrage or detention charge shall eliminate any obligation of the charged party to pay the applicable charge."

## V.    SHIPPING ACT VIOLATIONS

### 139.

Section 41102(c) of the Shipping Act (46 U.S.C. § 41102(c)) prohibits a common carrier or [MTO] from failing to "establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property."

56

#111642637v5

**140.**

Section 41104(a)(2) of the Shipping Act prohibits a common carrier from "provid[ing] service in the liner trade that is . . . not in accordance with the rates, charges, classifications, rules, and practices contained in a tariff published or a service contract entered into under chapter 405 of this title."

**141.**

Section 41104(a)(4) of the Shipping Act prohibits a common carrier "for service pursuant to a tariff [from] engag[ing] in any unfair or unjustly discriminatory practice in the matter of- (A) rates or charges… or (E) adjustment and settlement of claims."

**142.**

Section 41106(2) of the Shipping Act prohibits an MTO from "impos[ing] any undue or unreasonable prejudice or disadvantage with respect to any person."

**143.**

Section 40501(a)(1); (b)(2), (4) of the Shipping Act requires "common carrier[s]" like Zim Respondents to "keep open to public inspection in an automated tariff system, tariffs showing all its rates, charges, classifications, rules, and practices" that "list each classification of cargo in use" and "state separately each terminal or other charge, privilege, or facility under the control of the carrier or conference and any rules that in any way change, affect, or determine any part or the total of the rates or charges."

**144.**

Section 545.5 of the FMC regulations provides in pertinent part that "in assessing the reasonableness of demurrage and detention practices and regulations, the Commission will

#111642637v5

consider the extent to which demurrage and detention are serving their intended primary purposes as financial incentives to promote freight fluidity."

## 145.

Part 541 of 46 C.F.R. mandates certain requirements and practices with respect to "demurrage" (including "dwell") invoices issued by VOCCs and MTOs.

## 146.

The conduct of the Zim Respondents (as VOCCs) and Houston Bayport (as an MTO) alleged herein at ¶¶1-145 (as applicable), including with respect to their practices and relevant tariff terms, relating to the assessment of demurrage and/or "dwell" charges are directly related to receiving, handling, storing, or delivering property; are occurring on a normal, customary, and continuous basis (vis-à-vis multiple separate charges, over multiple months, involving 147 containers, all ostensibly pursuant to tariff provisions, *see, e.g., Simple Forwarding, Inc. v. China United Lines Ltd.*, Dkt. No. 2010(F) (ALJ Feb. 6, 2025) (notice not to review, March 11, 2025) (holding that "the normal, customary and continuous" element was satisfied when the detention fees on a single container were imposed pursuant to a tariff); and are unjust and unreasonable causing loss to Claimant. *See* 46 C.F.R. § 545.4.

## 147.

With respect to Houston Bayport as an MTO, its conduct alleged herein at ¶¶1-146 (as applicable) wrongfully sought to impose undue and unreasonable prejudice or disadvantage with respect to DQS (and/or its agents and intermediaries).

## 148.

The Zim Respondents and Houston Bayport have failed to establish and observe just and reasonable practices in violation of Section 41102(c) (as well as related FMC regulations

58

#111642637v5

including the D&D Rule, 46 C.F.R. § 545.5, 46 C.F.R. Part 541, and the incentive principle), further to the circumstances described above in ¶¶1-146 (as applicable), by assessing improper demurrage and/or "dwell" charges against the Containers that serve no incentivizing principle and do not promote freight fluidity.

### 149.

The Zim Respondents and Houston Bayport have likewise failed to establish and observe just and reasonable practices in violation of 46 U.S.C. § 41102(c) (as well as related FMC regulations  including the D&D Rule, 46 C.F.R. § 545.5, 46 C.F.R. Part 541, and the incentive principle) further to the circumstances described above in ¶¶1-146 (as applicable), by refusing to extend free time and/or waive or reduce demurrage and/or "dwell" charges for the Containers.

### 150.

The Zim Respondents and Houston Bayport have likewise failed to establish and observe just and reasonable practices in violation of 46 U.S.C. § 41102(c) (as well as related FMC regulations  including the D&D Rule, 46 C.F.R. § 545.5, 46 C.F.R. Part 541, and the incentive principle) further to the circumstances described above in ¶¶1-146 (as applicable).

### 151.

The Zim Respondents have violated 46 U.S.C. § 41104(a)(14) and (15) (as well as related FMC regulations  including the D&D Rule, 46 C.F.R. § 545.5, 46 C.F.R. Part 541, and the incentive principle), further to the circumstances described above in ¶¶1-146 (as applicable), by issuing the invalid and/or otherwise non-compliant CES Demurrage Invoices and Zim Demurrage Invoice; and by improperly pursuing the "terminal storage" demurrage charges in the SD Tex Suit without ever issuing any valid invoice for those amounts.

#111642637v5

**152.**

The Zim Respondents have likewise, further to the circumstances described above in ¶¶1-146 (as applicable), violated and 46 U.S.C. § 40501(a)(1), (b)(2), (4) and 46 C.F.R. § 520.7(a)(1)) and § 520.4(a)(2), by failing to include in their publicly accessible FMC-mandated tariff specified demurrage rates for shipper-owned containers, and instead providing only a single, unreasonable, non-specified demurrage rate for Zim-owned containers involved in interchange cargo trade; and in turn have likewise violated 46 U.S.C. § 41104(a)(2)(A) by providing service in the liner trade that not in accordance with the rates, charges, classifications, rules, and practices contained in a tariff published or a service contract under the Shipping Act, insofar as they have sought to impose non-tariff-specified demurrage rates to shipper-owned containers.

**153.**

The Zim Respondents have likewise violated 46 U.S.C. § 41104(a)(2) and (a)(4), further to the circumstances described above in ¶¶1-146 (as applicable), by seeking to charge invalid demurrage charges not in accordance with its applicable tariff terms (Section 41104(a)(2), and/or by engaging in "unfair or unjustly discriminatory practices" by seeking to impose invalid demurrage "rates and charges" (Section 41104(a)(4)(A)) and refusing to reasonably engage in "adjustment and settlement of claims" (Section 41104(a)(4)(E)) with respect to the invalid demurrage charges (and instead filing an improper/non-timely SDNY Suit).

**154.**

The Zim Respondents have likewise violated 46 U.S.C. § 41102(d)(2)(A), (B), further to the circumstances described above in ¶¶1-146 (as applicable), by retaliating against Complainants (as shippers/agents of shippers) with multiple lawsuit (despite the FMC's exclusive jurisdiction)

60

#111642637v5

following what they knew constituted an active demurrage dispute under 46 C.F.R. Part 541 and 46 U.S.C. § 41104.

### 155.

Houston Bayport as an MTO, and further to its conduct alleged herein at ¶¶1-146 (as applicable), has violated 46 U.S.C. § 41106(2) (as well as related FMC regulations including the D&D Rule, 46 C.F.R. § 545.5, 46 C.F.R. Part 541, and the incentive principle) when it wrongfully sought to impose undue and unreasonable prejudice or disadvantage with respect to Complainants (and/or its agents and intermediaries) by assessing improper demurrage and/or "dwell" charges against the Containers that serve no incentivizing principle and do not promote freight fluidity.

### 156.

Houston Bayport as an MTO, and further to its conduct alleged herein at ¶¶1-146 (as applicable) has violated 46 U.S.C. § 41106(2) (as well as related FMC regulations including the D&D Rule, 46 C.F.R. § 545.5, 46 C.F.R. Part 541, and the incentive principle) when it wrongfully sought to impose undue and unreasonable prejudice or disadvantage with respect to Complainants (and/or its agents and intermediaries) by refusing to extend free time and/or waive or reduce "dwell" charges for the Containers.

### 157.

The Zim Respondents further to their conduct alleged herein at ¶¶1-146 (as applicable) have likewise failed to establish and observe just and reasonable practices in violation of 46 U.S.C. § 41102(c) by prematurely filing the SDNY Suit and the SD Tex Suit in violation of 46 C.F.R. § 541.8, and thus have also violated 46 U.S.C. § 41104(a)(15).

#111642637v5

## VI.    CAUSATION AND INJURY TO COMPLAINANTS

### 158.

As a result of the Zim Respondents' and Houston Bayport's violations of the Shipping Act, and FMC regulations promulgated thereunder, Complainants have been injured and continues to incur ongoing injury with respect to:

i.    payment of $5,880 with respect to the improperly issued CES Demurrage Invoices (by Zim Respondents);

ii.    payment of $917,458.74 in improperly issued Port Import Dwell Fees (by Houston Bayport);

iii.    exposure to Zim Respondents' ongoing pursuit (including in the SDNY Suit) of the $7,050,260 of improperly charged demurrage amounts reflected in the Zim Demurrage Invoices and Zim Respondents' pursuit of un-invoiced amounts in the SD Tex Suit; and

iv.    incurred and accruing attorneys' fees and costs associated with the disputes set forth in this Complaint.

### 159.

As a result of the Zim Respondents' and Houston Bayport's violations of the Shipping Act, and FMC regulations promulgated thereunder,  Complainants are therefore entitled to an order that Zim Respondents cease and desist claiming the amount of $7,050,260 of improperly charged demurrage amounts reflected in the Zim Demurrage Invoices; together with an order that the improper demurrage charges previously paid by/on behalf of Complainants with respect to the CES Demurrage Invoices ($5,880) and the Houston Bayport Port Import Dwell Fees ($917,458.74).

#111642637v5

## VII.    REQUEST FOR AND DESIGNATION OF LOCATION OF HEARING

**160.**

Pursuant to 46 C.F.R. § 502.62(a)(5), Complainants request a hearing on this matter, and further requests that the hearing be held at the Federal Maritime Commission, 800 N. Capitol St., NW, Washington, D.C. 20573-0001.

## VIII.    PRAYER FOR RELIEF

**161.**

**WHEREFORE**, Complainants respectfully request that Respondents be required to answer the charges in this Complaint, and that after the Commission's investigation and hearing, the Commission issue an order:

1) Declaring that the demurrage and "dwell" charges sought by Respondents in this matter are unlawful.

2) Finding that the Zim Respondents have violated: 46 U.S.C. § 41104(a)(14)-(15)(A)(B); 46 U.S.C. § 41104(a)(2)(A), (c); 46 C.F.R. § 545.5; 46 C.F.R. §§ 541.1-541.8 by charging, accepting payment of, and pursuing improperly and wrongfully issued demurrage charges for the Containers in the circumstances alleged herein (viz. the charges issued pursuant to the CES Demurrage Invoices and the Zim Demurrage Invoices);

3) Finding that Respondent Houston Bayport has violated: 46 U.S.C. § 41104(a)(14)-(15)(A)(B); 46 U.S.C. § 41102(c); 46 U.S.C. 41106(2); 46 C.F.R. § 545.5; 46 C.F.R. §§ 541.1-541.8 by charging, accepting payment of, and pursuing improperly and wrongfully issued "dwell" charges for the Containers in the circumstances alleged herein (viz. the Port Import Dwell Charges);

4) Finding that pursuant to 46 U.S.C. § 41305(c) relating to violations of 46 U.S.C.§ 41102(c) Complainant DQS is entitled to additional amounts not to exceed twice the amount of the actual injury;

5) Finding that pursuant to 46 U.S.C. § 40501(a)(1); (b)(2), (4), Zim Respondents have failed to keep open a tariff showing all its rates, charges, classifications, rules, and practices between all points or ports on its own route, failed to list each classification of cargo in use, and failed to state separately each charge and rule[] that in any way change, affect, or determine any part or the total of the rates or charges;

63

Exhibit 1

6) Finding that pursuant to 46 U.S.C. § 41102(d)(2)(B), Zim Respondents have retaliated against a shipper and OTI by filing suit against the shipper/shipper's agents and an OTI following shipper's dispute of demurrage under 46 C.F.R. Part 541 and 46 U.S.C. § 41104.

7) Ordering that Respondents pay to Complainants attorneys' fees and costs, pursuant to 46 U.S.C. § 41305 and 46 C.F.R. §502.254, as well as interest from the date of injury pursuant to 46 U.S.C. § 41305 and 46 C.F.R. § 502.253; and

8) Providing such other and further relief that the Commission deems just and proper.

**DATED:** May 18, 2026

Respectfully submitted,

/s/ _____

**JONES WALKER LLP**

**JULIA BONESTROO BANEGAS**
jbanegas@joneswalker.com
(575) 640-8469
**KEIANA S. PALMER**
kpalmer@joneswalker.com
(202) 203-1024
1 M Street SE, Suite 600
Washington, DC 20003

-AND-

**CHRISTOPHER M. HANNAN**
channan@joneswalker.com
(504) 582-8353
**ILSA H. LUTHER**
iluther@joneswalker.com
(504) 582-8115
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170

*Counsel for Complainants Down Quark Systems LLC and SunnySide Digital Inc.*

64

#111642637v5